## GIB GAY v. THE STATE.

### No. 1740.   Decided February 22, 1899.

**1.   Grand Jury—Reassembling.**

The fact that upon the reassembling of the grand jury it was shown that the name of one W., who was one of the jurors, occurred twice on the list, by mistake, and that the name of one M., which did not appear on the list, should have appeared in one of the places where the name of W. was inserted by the mistake, does not constitute the grand jury thus reassembled a new grand jury, nor does it constitute a ground for quashing the indictment.

**2.   Same—Practice.**

To reassemble the same grand jury it is only required that the court should set aside the order discharging them and then order their reassembly.   Code Crim. Proc., art. 411. On their reassembly, it is not necessary to reimpanel them and go through the formality of testing anew their qualifications and reswear the members. It would be otherwise where other persons are summoned to fill out the original panel.

**3.   Summoning Special Venire—Sick Jurors—Diligence.**

It is the duty of the sheriff to summon jurors whose names are on the special venire, notwithstanding they may be sick or exempt from over age; and where a juror has not been summoned, the diligence used to summon him should be stated in the return of the sheriff; but a failure of such duty on the part of the officer is not ground for a reversal under the circumstances of this case.

**4.   Same.**

On a special venire ordered for one hundred jurors, where it appears that one of the persons was drawn and his name twice entered upon the list, thereby making in fact only ninety-nine jurors drawn; Held, this was a mere clerical mistake which did not vitiate the panel or constitute a ground to quash the venire.

**5.   Same.**

Where the sheriff has made a mistake as to his having summoned a juror, the defendant can not be heard to complain unless he asks for an attachment for the absent juror as soon as it is ascertained from the calling of the list that he is absent.

**6.   Murder—Evidence—Character of Deceased.**

On a trial for murder, if evidence as to the good character of the deceased is at all admissible, only his general reputation can be shown, and not the individual opinion of the witness to the effect that he was well thought of and was a good man.

**7.   Same—Declarations of Deceased as to His Ownership of Personal Property.**

On a trial for murder, where the death of the alleged deceased party is not conclusively established, and the defense was that he was not dead but had gone off—leaving the State; Held, that declarations of deceased to third parties before he disappeared, that a certain pipe in his possession and found in the house after his disappearance was a highly-prized keepsake he had received from a brother long since dead, was legitimate and admissible as evidence showing the improbability that he would go away, in the manner claimed by defendant, without taking said pipe with him. His declarations were verbal acts as to his title and possession of the pipe, and as such were not incompetent as being hearsay evidence.

**8.   Impeachment of Witness—Evidence in Rebuttal.**

Where it was sought to impeach the credibility of a State's witness by showing that he had falsely registered at a hotel as a resident of a certain town, when in fact he was living in another State; Held, it was competent in rebuttal for the State to show that he did formerly reside at the place named by him on the register, and his acquaintance with the parties there.

**9.   Evidence—Statements and Declarations of Defendant to an Officer Who Intended to Arrest Him.**

The voluntary statements of a defendant made to an officer who has practiced a ruse upon him in order to obtain testimony from him, are not incompetent or inadmissible

as evidence against him when he was not in arrest and there was no suggestion that he was to be arrested, though the officer states that he would not have let him go at that time, and he subsequently did arrest him.

**10. Same—Statements and Declarations of Deceased.**

Evidence of the statements and declarations of the deceased, to the effect that he had loaned money to the defendant, are not admissible when made in the absence of defendant.

**11. Same.**

On a trial for murder, where the alleged murdered party has disappeared, it is competent, in connection with other facts going to establish his death, to prove, as evidencing his intent to remain in that section of country, that he had made inquiries of different parties with reference to the purchase of land in the county.

**12. Murder in the Perpetration of Robbery—Indictment.**

Under an indictment for murder upon express malice, evidence is legitimate and admissible to show that it was committed in the perpetration of robbery. Following Sharpe v. State, 17 Texas Criminal Appeals, 486.

**13. Same—Charge of Court.**

On a trial for murder under an indictment which alone charges a murder upon express malice, it is error for the court to charge upon murder in the perpetration of robbery, where there was no evidence of a direct or immediate taking of property from the person or possession of the deceased by means of the robbery. A killing for the purpose of being able thereafter to assert and establish title in property owned by deceased would not constitute robbery.

**14. Murder—Corpus Delicti.**

It is essential to a conviction for any degree of culpable homicide, first, the deceased must be shown to have been killed; second, the killing must be proved to have been criminally caused, and the death of deceased must be shown to have been caused by the act or agency of the accused.

**15. Homicide—Identification of the Body or Portions of—Proof of.**

Our statute, Penal Code, article 654, provides that no person shall be convicted of any grade of homicide unless the body of the deceased or portions of it are found and sufficiently identified to establish the fact of the death of the person charged to have been killed. Held, this only requires that the proof be of a legal character—it need not be positive. If it be circumstantial, that is all that is necessary if it sufficiently identifies the remains, or the portions thereof found, as those of deceased.

APPEAL from the District Court of Hays. Tried below before Hon. H. TEICHMULLER.

Appeal from a conviction for murder in the first degree; penalty, imprisonment for life in the penitentiary.

The indictment charged appellant with the murder of H. C. Lindeman, on the 25th of August, 1897. It contained four counts. The first charged the killing by shooting with a gun; the second by cutting with a knife; the third, by burning with fire, and the fourth, in some way and manner and by some means, instrument, and weapons to the grand jurors unknown. The conviction was had upon the last count.

The opinion states the facts of the case as established by the evidence.

Errors complained of and discussed, are fully set forth below in the briefs of counsel.

*W. G. Barber* and *Franklin, Cobbs & McGown,* for appellant.—The court erred in overruling defendant's motion to quash and set aside the indictment herein, because it appears from said motion, the exhibits thereto, and the records of the court, that at the term of the court at

which this defendant was indicted a grand jury in and for Hays County was duly impaneled in the District Court of said county, and duly tried, sworn, and charged. That said grand jury was duly and finally discharged by said court without finding any bill of indictment against this defendant. That thereafter an order was entered by the District Court during said term of court, directing that said grand jury be reassembled, and it appears that when said grand jury was reassembled Henry Miller, a member of said grand jury, did not appear, and that another man appeared upon said grand jury, and that the court neither tried, swore, nor impaneled said grand jury, and that the indictment found in this case was found by a grand jury that was neither tried, impaneled, nor sworn, and that was not composed of the same men who composed the grand jury originally selected, tried, impaneled, and sworn in said court at said term.

If a grand jury is discharged, when reassembled they must be again tested as to their qualifications and duly sworn. Trevinio v. State, 27 Texas Crim. App., 372; Smith v. State, 19 Texas Crim. App., 106.

We contend that a body of men who are neither tried nor sworn is not a grand jury, and the question becomes one of jurisdiction which can not be waived nor avoided. See Lott v. State, 18 Texas Crim. App., 627; Rainey v. State, 19 Texas Crim. App., 479; McNeese v. State, Id., 48; Smith v. State, Id., 95; Ex Parte Reynolds, 35 Texas Crim. Rep., 437. Such an objection may be made at any time, even after final judgment, as was done in the Reynolds Case.

Where a person not duly impaneled as a grand juror is present during their deliberations, the indictment should be set aside. Code Crim. Proc., art. 559; Woods v. State, 26 Texas Crim. App., 490; Doss v. State, 28 Texas Crim. App., 506; Hamilton v. State (Ga.), 23 S. E. Rep., 824.

The court erred in overruling the defendant's motion to quash the special venire summoned in said court, and in overruling defendant's motion to quash the copy of the jurors summoned on said special venire, which was served on defendant, and in not requiring service of a true and certified copy thereof on defendant for a full day before proceeding to impanel the jury.

The bill shows that a venire of 100 men was ordered. F. B. Lobenski was twice drawn and put on the list, so that only 99 men were drawn. The sheriff's return on the special venire shows three jurors, Northcott, Rowland, and Martindale, not summoned by him because they were sick, and as to the juror Richards, the return is "not found," nothing more.

The clerk must draw the number of jurors ordered for the special venire. Code Crim. Proc., arts. 645, 647; Hunter v. State, 34 Texas Crim. Rep., 599.

The sheriff must summon the jurors drawn, and has no right to himself pass on excuses and excuse jurors in advance by not summoning them, and if the officer fails to summon a juror he must show in his return why, and the diligence used. Code Crim. Proc., arts. 650-658;

Robles v. State, 5 Texas Crim. App., 346; Thompson v. State, 19 Texas Crim. App., 593; Neyland v. State, 13 Texas Crim. App., 543.

The bill of exception number 4 shows Whisenant was a qualified juror of Hays County; that the sheriff returned him as duly served; that he appeared upon copy served on defendant as one of the jurors summoned to try his case; that after service of the copy the sheriff discovered that Whisenant had not been served and noted same in pencil on original venire; that defendant was forced into trial with the jury as summoned; that when Whisenant's name was called he did not appear; that defendant called the court's attention to his name being on his list as one of the jurors summoned and demanded that the impaneling of the jury be delayed until the juror was brought in and tendered to him, or that a new venire be drawn and furnished him, but the court refused this demand and refused to order process of any kind for the juror, and proceeded with the impaneling of the jury; and having exhausted the special venire without obtaining a full jury, twice ordered talesmen summoned and proceeded to impanel the jury from the talesmen so summoned by the sheriff and his deputies; that when eleven jurors had been obtained and defendant had but one peremptory challenge left, a twelfth juror so summoned as a talesman was tendered him, and defendant then again repeated his demand as to the juror Whisenant, and asked to be furnished that juror before passing on the one tendered, or to be furnished a new venire; that the district attorney informed the court that Whisenant could be brought into court within two hours, to which the court replied that he had no doubt about the matter, but that if the State's attorneys had any doubt the further impaneling would be delayed until the juror could be brought in, but being assured that the State's attorneys had no doubt, the court again refused defendant's request and required him to pass upon the juror, who was peremptorily challenged by defendant with his last challenge; and the court thereupon caused to be called and tendered to defendant another juror from said talesmen, whereupon the defendant again insisted upon his former request as to the juror Whisenant and same was overruled, and his challenges being exhausted, the talesman was, over defendant's objection and protest, impaneled as the twelfth juror and tried defendant.

In a capital case, when the copy, as served upon defendant, of the jurors summoned upon the special venire, shows a juror who was not in fact summoned, the court should, when his name is reached in regular order, either suspend proceedings until the juror can be brought in or should order a new venire and begin anew. Code Crim. Proc., arts. 653, 654; Osborn v. State, 23 Texas Crim. App., 431; Kellum v. State, 24 S. W. Rep., 897; Harrison v. State, 3 Texas Crim. App., 558; Bates v. State, 19 Texas, 123; Thurston v. State, 18 Texas Crim. App., 26; Cahn v. State, 27 Texas Crim. App., 736.

The court erred in permitting the witness Thomas D. Fulgram to testify that he had known the alleged deceased in Arizona for eight or ten years, and that Lindeman had never been charged with any criminal

offense during said time, was well thought of and was a "good man,". over the objection of the defendant that said testimony was irrelevant to any issue in the case; that the question of whether or not the alleged deceased was a good or bad man was immaterial to any issue in the case, and that the only purpose of the testimony was to inflame the minds of the jury against the defendant, and that if Lindeman's character was in issue only his general reputation could be shown, and not the opinion of the witness.

The State can not, over defendant's objection, prove a good character for deceased, or that he was well thought of, or that he was a good man, especially where defendant has made no issue thereon. And even if his character was in issue the witness could only testify to the general character of the deceased, and not to his own ideas or opinion. Miers v. State, 29 S. W. Rep., 1074; Irvine v. State, 26 Texas Crim. App., 37; Graves v. State, 14 Texas Crim. App., 113; Plasters v. State, 1 Texas Crim. App., 683; Brownlee v. State, 13 Texas Crim. App., 255; Stewart v. State, 26 S. W. Rep., 203; Stevens v. State, 1 Texas Crim. App., 591; Parker v. Commonwealth (Ky.), 28 S. W. Rep., 500; Com. v. Hoskins (Ky.), 35 S. W. Rep., 284; Ryan v. State, 35 S. W. Rep., 288; 5 Am. and Eng. Enc. of Law, 2 ed., 852, 853; 3 Greenl. Ev. (Lewis' ed.), sec. 27; State v. McCarthy, 9 So. Rep. (La.), 493; Ben v. State, 37 Ala., 103; 1 Whart. Crim. Law, sec. 641, p. 549; State v. Potter, 13 Kan., 415; State v. Eddon (8 Wash.), 36 Pac. Rep., 139; 2 Bish. Crim. Proc., sec. 612.

The court erred in admitting the testimony of the witness Thomas D. Fulgram, to the effect that H. C. Lindeman, the alleged deceased, prior to leaving Arizona, had told said witness that a certain pipe, which said witness testified belonged to said Lindeman, had been given to him, Lindeman, by his, Lindeman's brother, which brother was dead, the said pipe being used by the State in evidence as having been found at the residence of defendant, and as circumstantial evidence tending to show that the said Lindeman had been killed by the defendant. Which said testimony of the said witness as to the statements made to him by said Lindeman were objected to by the defendant upon the ground that same were hearsay and therefore inadmissible; and also because the same were irrelevant to any issue in the case, and the only purpose for introducing the same was to inflame the minds of the jurors trying the case against the defendant.

The evidence objected to was clearly hearsay, and not covered by any exeption to the rule which excludes such evidence. Campbell v. State, 8 Texas Crim. App., 84.; Hammel v. State, 14 Texas Crim. App., 326; Robison v. State, 16 Texas Crim. App., 347; Harris v. State, 1 Texas Crim. App., 74; Belverman v. State, 16 Texas, 131; Stringfellow v. Montgomery, 57 Texas, 349; Reeves v. State, 7 Texas Crim. App., 276; Queen v. Hepburn, 7 Cranch, 290; Gillett on Coll. Ev., secs. 225, 226; 1 Rice on Ev., pp. 373, 374.

The court erred in charging upon a murder in the perpetration of robbery.

The indictment must allege each fact essential to its case, and an allegation that an unlawful killing became murder in the first degree, by reason of the existence of malice aforethought, is not equivalent to and does not include an allegation that an unlawful killing is murder in the first degree, because done in the perpetration of robbery. See dissenting opinion of Judge Hurt in Sharpe Case, 17 Texas Crim. App., 500; Wilkins v. State, 35 Texas Crim. Rep., 525.

There is no evidence in the case to show that Lindeman was killed in the perpetration or the attempted perpetration of robbery by the defendant, and it was error for the court to charge the jury as set out in the foregoing assignment upon an issue not raised by the evidence.

The court erred in permitting the witness Thomas D. Fulgram, over the objection of the defendant, to testify that he was acquainted with the Rev. Mr. Joyce, Mr. James Malone, and other citizens of good standing in Hays County, Texas, before he removed to Arizona, which proof was permitted upon the ground that defendant had impeached the character of said witness by showing by him that he had voluntarily come from Arizona to Texas to testify in this case, and that he had registered in San Marcos, Texas, at the hotel as being from Seguin, and not from his residence in Arizona; and by asking the witness whether or not he had stated to W. G. Barber, counsel for the defendant, a day or two after his arrival in San Marcos, that he was an insurance agent, when in fact he was not an insurance agent, to which question the witness answered that he had not so stated to the said Barber, and had never claimed to said Barber that he was an insurance agent, and all of which evidence was introduced over the objections of the defendant, as follows:

1. That the character of said witness had not been impeached by the proof that he had registered from Seguin, and the proof that he had voluntarily attended court from Arizona, and that no testimony had been introduced contradicting the statement of the said witness that he had not told W. G. Barber that he was an insurance agent.

2. That inasmuch as the defendant had not introduced any testimony showing that said witness had a bad reputation for truth and veracity, nor showing that he had made contradictory statements with reference to material matters, that no predicate existed authorizing the introduction by the State of any evidence to show that the character of said witness for truth and veracity was good.

3. That the testimony elicited from said witness as to his acquaintance did not establish his reputation for truth and veracity, and that the fact that he was acquainted with the said citizens was not admissible for the purpose of showing that his reputation for truth and veracity was good.

4. That said testimony was irrelevant to any issue in the case, and the sole purpose of its introduction was to prejudice the jury in favor of said witness and against the defendant.

5. That the testimony of the said witness as to his acquaintance with the gentlemen named showed that he knew those gentlemen some eight or ten years previous to the time that he testified, and that since knowing them he had continuously resided in Arizona, and had not returned to Texas except upon two occasions, and then only for the purpose of visiting his daughters in the town of Seguin, and that even if said tes- timony could be regarded as admissible to show his reputation for truth and veracity, the time at which said reputation was fixed was too re- mote from the time at which witness testified to be admissible.

First.   Said evidence was not relevant to any issue, and therefore inadmissible.

Second.   If the State was entitled to support the character of the wit- ness it could only be done by showing his general reputation.   Griffin v. State, 26 Texas Crim. App., 157; Holsey v. State, 24 Texas Crim. App., 35; Marshall v. State, 5 Texas Crim. App., 273; Brownlee v. State, 13 Texas Crim. App., 255; Boon v. Weathered, 23 Texas, 675; Kennedy v. Upshaw, 66 Texas, 452; 1 Greenl. Ev., sec. 469.

Third.   The witness not living in Hays County, and never having lived there, no evidence would be admissible as to his character there.

One of the vital issues in the case was the identification of the few bones and ashes found as being part of the remains of H. C. Lindeman, and the court should have given the requested instruction, as it clearly brought before the jury that issue and called their attention particularly to the fact that there could be no conviction in the case unless they be- lieved that the evidence showed beyond a reasonable doubt the identifi- cation of said remains as portions of the body of H. C. Lindeman. Whilst the court charged generally upon this subject, it is evident from the court's charge that it intended that the jury might look to the disappear- ance of Lindeman as evidence of the identification of the remains.   This we do not understand to be the proper construction of our statute.

In charging the jury, the court in its main charge informed them that the defendant could be convicted of murder in the first degree, in the event they found that Lindeman was killed by the defendant in the perpetration of robbery or attempted robbery.   Whether Lindeman was so killed was made, therefore, by the charge of the court a vital issue in the case, and it became necessary for the jury to consider whether there was any evidence in the case of robbery or attempted robbery.   The only evidence relied upon by the State to establish the fact of robbery was the alleged possession by the defendant of some of the property of Linde- man.   As the defendant explained this possession, and his explanation was introduced in evidence by the State, the defendant's explanation of this possession must be accepted as true, unless disproved by the State. The court therefore should have given the instruction requested, as follows:

"It is incumbent on the State to prove by competent evidence, beyond a reasonable doubt, that H. C. Lindeman is dead, and if you find from the evidence that defendant Gay stated prior to his arrest that Linde-

man had left Hays County, and that these statements were introduced in evidence by the State, then the burden of proof is on the State to show by competent evidence, beyond a reasonable doubt, that said statements are untrue, and that said Lindeman did not leave Hays County, as stated by defendant, but that said Lindeman was killed in Hays County, Texas, by the defendant." Willson's Crim. Stats., sec. 1300, and cases cited thereunder.

The court erred in permitting the introduction of testimony by various witnesses as to the declarations and statements made by the alleged deceased at different times and different places and to different persons, and not in the presence of the defendant, over the objections of the defendant that said statements were hearsay, that they contained relations of past occurrences, that they were irrelevant to any issue in the case, and that the death of the alleged deceased could not be shown by statements of his intentions and purposes prior to the time of his alleged disappearance; all of which testimony is shown by bills of exception filed herein. This testimony was irrelevant to any issue in the case. It was hearsay, and even if made in the presence of the defendant, did not call for any response from him, and was therefore inadmissible as admissions by him. They were admitted by the court upon the theory that they tended to show no reason upon the part of Lindeman to leave the country, and that they were therefore evidence that he had been killed. As the alleged remains had in no manner been identified as the remains of Lindeman and the fact of his death thus proven, the testimony above referred to was irrelevant. Even if admissible, however, it was the duty of the court to instruct the jury that it was admissible solely for the purpose of showing the intention of Lindeman to remain in Hays County. It was particularly important that such a charge should be given, because some of the testimony showed possession of money by Lindeman, and that he had loaned defendant some $600 with which to buy cattle, and this testimony might have been considered by the jury as showing that the defendant had acquired possession of certain of Lindeman's property by murder or robbery.

The verdict of the jury is contrary to the law and evidence in each of the following particulars:

1. The evidence was insufficient to show beyond a reasonable doubt that H. C. Lindeman, the alleged deceased, is in fact dead.

2. If it be admitted that H. C. Lindeman is dead, the evidence is insufficient to show that this defendant killed him.

3. The corpus delicti is not proven in this case. The proof in the case is utterly insufficient to meet the requirements of the article of the statute, which provides that "No person shall be convicted of any grade of homicide unless the body of the deceased or portions of it are found and sufficiently identified to establish the fact of the death of the person charged to have been killed."

4. The evidence is insufficient to prove beyond a reasonable doubt the existence of express malice, or to show that the killing, if any, was committed in the perpetration of or attempted perpetration of robbery, and therefore fails to make a case of murder in the first degree.

5. There is no evidence in the case supporting the allegation in the last count in the indictment, which alleges that the defendant did kill Lindeman "in some way and manner, and by some means, instruments, and weapons to the grand jurors unknown." The State having abandoned each of the other counts in the indictment, was required to prove the last count with this essential allegation, and there is no proof whatever but what the manner in which Lindeman was killed, if at all, was clearly shown to the grand jury which found the indictment.

It is impracticable to condense the testimony in this case in the limits of a brief. Leaving out details, the proof stands thus: 1. Lindeman has disappeared. 2. The defendant has been found in the possession of certain of his property, which he says he obtained from Lindeman by purchase in part, and that a few articles were left by Lindeman at the residence of defendant's mother. 3. Some weeks after the disappearance of Lindeman a pile of ashes is found upon a mountain side, a short distance from defendant's residence, and in these ashes a few pieces of bone, two or three teeth, a strand or two of hair, and several buttons are found by sifting the ashes. The bones together do not more than fill an ordinary water glass. The buttons are few in number, and are not identified as the buttons worn by Lindeman. The bones are not identified as the bones of Lindeman, neither is the hair. This is the evidence, and all the evidence. Walker v. State, 14 Texas Crim. App., 609 (citing Wilson v. State, 41 Texas, 320; 3 Greenl. on Ev., sec. 131; Stark on Ev., 862, 863; 1 Bish. Crim. Proc., 1056, 1057; 2 Hale, 290; Whart. on Homicide, 629, 630; Whart. Crim. Ev., 632); Puryear v. State, 28 Texas Crim. App., 73; Ah Hang v. State, 18 Texas Crim. App., 675; Lightfoot v. State, 20 Texas Crim. App., 77; Wilson v. State, 41 Texas, 320; Taylor v. State, 35 Texas, 97; Wilson v. State, 43 Texas, 472; Scott v. State, 23 Texas Crim. App., 521; Schulze v. State, 28 Texas Crim. App., 316; Morris v. State, 30 Texas Crim. App., 95; Jackson v. State, 29 Texas Crim. App., 458; Hunter v. State, 34 Texas Crim. Rep., 599; Kugadt v. State, 38 Texas Crim. Rep., 681; Pitts v. State, 43 Miss., 472; Sam v. State, 33 Miss., 347; Mathews v. State, 55 Ala., 187; People v. Palmer, 109 N. Y., 113.

In addition to their brief, counsel also filed an able printed argument upon the insufficiency of the evidence to establish the corpus delicti.

*Mann Trice*, Assistant Attorney-General, for the State.—Article 397, Code of Criminal Procedure, limits and restricts objection to the qualifications and legality of the grand jury to challenge before impanelment, and in no other way shall objections be heard. State v. Vahl, 20 Texas, 779; Hudson v. State, 40 Texas, 12; Owens v. State, 25 Texas Crim.

App., 552; Woods v. State, 26 Texas Crim. App., 506; Webb v. State, 40 S. W. Rep., 989.

The motion to quash filed here does not come within the meaning of article 559, Code of Criminal Procedure, or set up any cause permissible by law to set aside an indictment. Carter v. State, 39 Texas Crim. Rep., 345; Barber v. State, 46 S. W. Rep., 233. Therefore no error is shown in overruling same.

Nor did the court err in refusing to hear proof that in fact the grand jury were not resworn when they reassembled, and in so far as the case of Trevinio v. State, 27 Texas Criminal Appeals, 378, may seem to hold to the contrary, same is dicta, and not conclusive of the question here presented. New Code Crim. Proc., art 411.

No error is shown by refusal to quash special venire and officer's return thereon. Charles v. State, 13 Texas Crim. App., 658.

It has been repeatedly held by this court that it is not required that every person drawn as a juror on a special or other venire should be summoned. Harris v. State, 6 Texas Crim. App., 97; Taylor v. State, 14 Texas Crim. App., 340; Rodriguez v. State, 23 Texas Crim. App., 503; Lewis v. State, 15 Texas Crim. App., 647; Murray v. State, 21 Texas Crim. App., 466; Brotherton v. State, 30 Texas Crim. App., 369; Jackson v. State, 30 Texas Crim. App., 664.

Nor did the court err in refusing to quash the return of the sheriff. The return is sufficient and shows diligence, especially in view of the fact that appellant did not controvert it or ask for process for the absent veniremen. The return shows not executed as to the following named persons, for reasons set opposite their names:

"J. O. Rowland, sent certificate of sickness. C. W. Richards, not found. W. A. Thompson, over age and claims his exemption. R. Martindale, sick and unable to come. John Storts is not a qualified juror; was excused."

It is to be presumed that the officer did his whole duty in making the return, and appellant would be in no position to complain unless he controverted the diligence and the facts stated in the return, and applied for attachments for the absent jurors. The bill fails to show that this course was pursued. Therefore no error appears. Livar v. State, 26 Texas Crim. App., 115; Kennedy v. State, 19 Texas Crim. App., 618; Thompson v. State, 19 Texas Crim. App., 593; Williams v. State, 29 Texas Crim. App., 89; Code Crim. Proc., art. 651, note 1.

No error appears by reason of J. N. Whisenant not being tendered as a juror. It does not appear from the bill of exceptions that when the names of those summoned were first called at the courthouse door and when Whisenant failed to answer that appellant then asked for an attachment for said Whisenant as required by article 655, Code of Criminal Procedure, new code. "Under this provision of our statute, in order for a party to avail himself of his right to have an attachment for the absent special veniremen, he should apply for the same as soon as it is ascertained by the call at the courthouse door that any of the jurors are

not present. If he fails to apply for his attachment at the time, then he is presumed to have waived the same." Jackson v. State, 30 Texas Crim. App., 666; Hudson v. State, 28 Texas Crim. App., 327; Kennedy v. State, 19 Texas Crim. App., 618; Sinclair v. State, 35 Texas Crim. Rep., 130.

If the testimony of Fulgram to the effect that deceased had never been charged with a criminal offense while he lived in Arizona, and was well thought of and a good man, be error, then as said in Graves' Case, 8 Texas Criminal Appeals, 120, "it is an error of such a trivial character as to be of no appreciable consequence, and would not warrant a reversal of the judgment." This evidence was relevant and admissible as tending to rebut any theory that might be suggested on the line that deceased had fled the country on account of criminal charges pending against him. Gose v. State, 6 Texas Crim. App., 121; Reynolds v. State, 8 Texas Crim. App., 412.

Witness Fulgram, after identifying Lindeman's pipe, said: "I have smoked the pipe. I would not be positive how long I knew of Lindeman's having the pipe, but think it was his brother's. His brother is dead. I got this information from Lindeman himself." It will be noted in this connection that the seventh bill of exceptions complaining of this testimony does not specifically state that appellant objected to said testimony when it was offered, or that the objection was interposed before the testimony was elicited. But be that as it may, it was competent to show in what respect deceased held said pipe; that is, how he regarded it, whether as in the light of an ordinary possession, or whether he attached any special value or sanctity to it. This could only be shown by his declarations and as to how he treated it. This independent circumstance was competent evidence, and as to whether he attached any special importance to same or not could be shown by his declaration in regard thereto.

The indictment charges murder of the first degree; therefore, no error in admitting evidence tending to show robbery as the motive, and charging that all murder committed in the perpetration or attempted perpetration of robbery is murder in the first degree. Sharpe's Case, 17 Texas Crim. App., 486; Roach v. State, 8 Texas Crim. App., 491; May v. State, 33 Texas Crim. Rep., 74; Little v. State, 331 Jour. of App., Nov. 17th.

The second, third, and fourth grounds of objection to the charge of the court in submitting the issue as to whether the homicide was committed in the perpetration or attempted perpetration of robbery seems to be predicated upon the theory that there is not sufficient evidence to show that the unlawful purpose of appropriating the property of Lindeman was conceived by appellant prior to the killing. Now, there is no question but what the record shows that appellant was in possession of and claimed all the worldly effects of Lindeman after the homicide. "Under all the authorities, evidence of the conduct of the deceased after the killing is admissible to show the animus that actuated him at the time, and it would be a strange doctrine that would limit the testimony

to what occurred before and at the very time of the killing. * * * If the homicide was committed for the pupose of robbery, as contended by the State, we would expect to find the actual taking of the money and goods from the body of the deceased after the homicide, and not before. Such is the general experience when murder is committed for the purpose of robbery." Little v. State, 39 Texas Crim. Rep., 654.

The next, and to my mind the most difficult question of solution, is, is the evidence sufficient to sustain the verdict? If positive and direct evidence of the corpus delicti be required, then the evidence fails in this particular. It is, however, well established by the weight of authority and by the decisions of this court, that direct evidence is not indispensible, and same may be established by circumstantial evidence. Kugadt v. State, 38 Texas Crim. Rep., 681; State v. Williams, 78 Am. Dec., 248; State v. Martin, 18 Crim. Law Mag., 608.

Corpus delicti may be proved by circumstantial evidence. Direct and positive evidence is unnecessary to prove the corpus delicti. United States v. Williams, 1 Cliff., 21, 26; State v. Keeler, 28 Iowa, 531; State v. Dickson, 78 Mo., 438; Carey v. State, 26 Tenn., 499. It may be proved by circumstantial evidence, if it be strong and cogent, and leave no room for reasonable doubt. See discussion of this point in a brief note to Ripley v. Miller, 62 Am. Dec., 184, 185; also in the principal case, King v. Hindmarch, 2 Leach, 569; Regina v. Cheverton, 2 F. & F., 833; Brown v. State, 1 Texas Crim. App., 154; State v. Dickson, 78 Mo., 438; McCulloch v. State, 48 Ind., 109; United States v. Williams, 1 Cliff., 21; Stocking v. State, 7 Ind., 326; Ruloff v. People, 18 N. Y., 179; People v. Bennett, 49 Id., 137; Wilson v. State, 43 Texas, 472; State v. Winner, 17 Kan., 296; 10 Cent. L. J., 165.

HENDERSON, JUDGE.—Appellant was convicted of murder in the first degree, and his punishment assessed at confinement in the penitentiary for life, and he appeals.

The facts connected with the case, briefly stated, are these: Appellant's mother lived in Hays County, some twelve or fourteen miles from Kyle, in a brushy, mountainous region of said county, west of Kyle. She had a little farm and pasture; and with her lived her sons, Leonard and Clay, and a daughter, and at times appellant, another son, stopped with her, but generally he was away from home, in the cattle business. Her nearest neighbor lived about one mile distant. There were several others, who lived two to three miles away. The deceased, Charles Lindeman, prior to about the 1st of July, had been living in Arizona, and was engaged in the cattle business. He was a German, a single man, 35 or 40 years old, and had no relatives living in that country. Defendant had been absent from Texas for some year or more, working in the cattle business, in Arizona, in the same vicinity with Lindeman. Some time in June, 1897, Lindeman sold out his cattle interest in Arizona for some $2500, and he and appellant came to Hays County, and immediately on their arrival at Kyle went to the home of appellant's mother.

On the 26th of June they returned to Kyle together. Lindeman deposited in the Kyle Bank $2100. Appellant, on the 2d of July, deposited in the same bank $550. The parties made a written contract to engage in the cattle business; Lindeman agreeing to advance so much money to appellant, and to take it out of the cattle when sold. They bought cattle together in that and an adjoining county from time to time, checking out of the bank for the payment of the same. The cattle were driven to the pasture of Mrs. Gay. They brought a trunk, evidently belonging to Lindeman, and perhaps some other baggage, from Arizona. This was carried out to Mrs. Gay's, and her home was their headquarters. On the 25th of August both parties came to Kyle together. Lindeman drew out $527.34, the balance due him. Appellant drew out $150 of his deposit, still leaving $303.25 in the bank. It was stated at the time that they intended to carry this money to San Marcos for the purpose of depositing it in bank, as some apprehension was expressed as to the safety of the Kyle bank. At the same time they procured the written contract between themselves, concerning the cattle business, from Helman, with whom it had been deposited, ostensibly for the purpose of having the same recorded in the county clerk's office at San Marcos. They did not, however, go to San Marcos. They were seen returning together that evening to Mrs. Gay's. Gay was seen in the immediate neighborhood the next day, but no person is shown to have seen and identified Lindeman in that section after said afternoon. On Friday morning, the 28th of August, appellant was seen early in the morning, between daylight and sunrise, in Buda (a little station on the International & Great Northern Railroad, a few miles north of Kyle, between that place and Austin,—about fifteen miles from Mrs. Gay's, some three miles further than Kyle). Appellant was riding one horse and leading another saddled horse, at the time, and was coming from below Buda, in the direction of a flat, and stated that he had brought Lindeman to Buda the night before, for the purpose of taking the train; that he was too late for the night train, and they concluded to stop out in the woods, as it was not convenient to get lodging; and appellant left him early in the morning to take the train. Appellant is not shown to have definitely stated where Lindeman said he was going. To some he appears to have stated that he was going to buy cattle down where they had been; that he had gone north on the train. One witness testified to having seen defendant and another man, both riding horseback, passing through Buda late on the night before. Did not recognize the other man, but identified defendant. Appellant is also shown to have stated to one witness afterwards that Lindeman took the train at Kyle. The evidence tends to show that Lindeman did not take the train at Buda on that occasion. The State's testimony shows that the train did not stop there that morning. Appellant offered testimony, however, tending to show that it did stop at Buda. On the Sunday following, appellant drew a draft in favor of Samanago, who lived near him, between his mother's and Kyle, for $303.25, the balance due him by the bank.

This appears to have been an accommodation loan. After the disappearance of Lindeman, appellant claimed the interest of Lindeman in the cattle purchased by them, stating that he had given $350 for the same. Lindeman left his trunk, some clothing, a pipe, saddle, and pony, at Mrs. Gay's. The mysterious disappearance of Lindeman soon attracted attention in the neighborhood, and a reward was offered for his discovery. About the 4th of October following, the sheriff and a posse made search of the premises and pasture of Mrs. Gay, and about a thousand yards from her house, in the pasture, in a rather secluded spot they discovered some ashes, evidently where some human body had been burned, some of the witnesses say apparently about three or four weeks before. We quote from one witness in regard to this matter as follows: "About a quarter or half mile from the Gay house I found where there had been a fire. At the point where we found the fire, it was brushy and hilly. In some spots the undergrowth was thick. At the point where I found the fire there is a little ravine. I saw from the leaves that there had been a fire before I got down off of my horse. You could get into where the fire was upon your horse on the side I was, and on the other side you could ride close to it. I scratched around a little with a stick in the ashes, and found two or three bones and a button. * * * We found ashes, bones, teeth, buttons, and brads used on duck pants, and small pieces that looked like leather, and a lock of hair. The buttons were pants buttons. The evidence of fire upon the trees was about twenty feet high. The ashes covered a space about six feet long and four feet wide." One witness says there was about the ashes charred wood, and he saw the effect of the fire on a tree as high as forty feet. The leaves at the time had changed their color, some by fire and some from the turning of the season. All these articles were sifted from the ashes and preserved. As to the buttons, it was shown that five of them were large metal buttons, and five smaller buttons. The large buttons were unmarked, and the small ones marked "St. Louis Faultless." The testimony of Helman, the State's witness, showed that, about a month previous to the disappearance of Lindeman, he bought from him a pair of overalls. Said overalls had eight large and four small buttons. The large buttons were marked, and the small ones not. A few still smaller buttons were found, which appeared to be shirt buttons, and also some brads, but there was no testimony tending to identify these as the property of Lindeman. Pieces that looked like burned leather and also pieces that looked like cloth were found. A small bunch of hair was also found near the fire, and, in general appearance, this was stated to have resembled the hair of Lindeman. The teeth found were detached, no portion of the jawbone appearing, and were shown to be considerably charred, but identified as the teeth of some human being. Dr. A. J. Bell testified as follows in regard to the teeth and bones: "There are five of these teeth shown me, two of which are white and the other three are very dark. The teeth that are so black seems to extend through the whole tooth. I can not account for this

black, except the peculiar position occupied in the fire. I do not think they are artificial teeth. ⁂ ⁂ ⁂ This bone that I think is the bone of the big toe seems to be all there. Some of it seems to have been broken off, but the general shape is there. The big toe bone is a little over an inch in length, and is about one-quarter inch in diameter one way, and a little over one inch the other. The bone which I think is from the small toe shows, from the measurement, to be about one-eighth inch in diameter one way and the other about one-sixteenth. All of these, together, are very small pieces of bone. All the bones and teeth, together, would not fill an ordinary glass tumbler. This little bunch of hair shown me has sixty or seventy strands. It is very fine, and a light brown color. I do not see any gray hairs among it." Dr. Ed. Bell described some other bones in addition to those mentioned, and stated "that he thought the bone he then held in his hand was the first rib bone, but not the whole of it. This other looks like a little bone in the throat, called the 'hyoid bone.'" Dr Jordan corroborated said witnesses as to the bones and hair; that he also thought the small bone shown him was the hyoid bone, which supported the tongue. Dr. Hons stated that he thought the larger bone shown him was the bone of the big toe of a human being, and the smaller bone was a bone of the human finger. Another bone was the hyoid bone, to which the muscle of the tongue attaches. "There is no other bone in the human body like it, that I know of." He stated that he was not able to tell whether the teeth shown him were human teeth or not. The two long black teeth looked like bicuspids, and the smaller white teeth incisors, from the lower jaw. And to the same effect is the testimony of Dr. Pertle. This was substantially all the testimony tending to identify the remains found in the fire. The State offered some testimony tending to show the previous financial condition of appellant, and that he was not able to have purchased the cattle, and that he not only claimed Lindeman's cattle afterwards, but was shown to have had considerable money. The defendant, in rebuttal of this, offered testimony tending to show that appellant had enough money to have made the purchase. There was also testimony on the part of the State tending to show that Lindeman expected to remain in that community for several years. Defendant offered testimony tending to show that he was dissatisfied with the country and expected to leave. The State introduced one Fulgram, who lived in Arizona, in the same neighborhood of Lindeman, and he stated that he knew of Lindeman leaving said country, but he had not returned. This was substantially all the testimony in the case.

Appellant made a motion to quash the indictment on the ground that the grand jury which found the bill had previously been adjourned for the term, and that when it was reassembled it was not then impaneled and sworn according to law; and, furthermore, that when it was reassembled it was not composed of the same grand jurors which had been impaneled at the beginning of the court; that one Henry Miller's name did not occur on the list, but that the name of Henry Wagner occurred

twice. It was shown, as to this, that the name of Henry Wagner occurred twice by mistake, and that Henry Miller's name should have appeared in one place instead of the name of said Wagner. This sufficiently shows that it was the same identical grand jury which had been originally impaneled at the beginning of said term of court, and it was not necessary, when they were reassembled, to reimpanel them; that is, it was not necessary to go through the formality of testing them as to their qualifications, and reswear the members of said grand jury. Article 411 of the Code of Criminal Procedure of 1895 controls this matter, and does not apprehend, where the constituents of a grand jury reassembled are the same, that the court shall do more than set aside the order discharging the grand jury, and then order their reassembling. Of course, it would be different where the original grand jury does not attend, and other persons are summoned to fill out the original panel.

Appellant made a motion to quash the special venire of 100 men on two grounds: The first, on the ground that F. B. Lobenski, who was one and the same person, was drawn twice on said jury, so that in fact only ninety-nine jurors were drawn; and again, that the officer making his return stated, as to Northcott and R. Martindale, that they were sick, and unable to come, and that W. O. Thompson was over age, and claimed his exemption, and C. W. Richards not found. He claims, as to these, that it was not the sheriff's duty to judge of the inability of these men to attend court, because of sickness; that he should have served them, and, if they had any excuse to render, they should have made it to the court. As to C. W. Richards, that he merely returned that he was not found, without stating what diligence he had used in order to find him. We agree with the contention of counsel that it was the duty of the sheriff to have summoned these jurors, notwithstanding they were sick, and, as to Richards, the diligence should have been stated. As to the juror Lobenski, we are referred to the case of Hunter v. State, 34 Texas Criminal Reports, 599. That was not like the case at bar. In said case, ninety jurors were ordered to be drawn and summoned by the court, and the clerk only drew a list of sixty. This was a clear violation of the order of the court, and unauthorized. In this case, a simple mistake occurred as to one juror in drawing his name from the list twice. A mere clerical mistake, such as this, will not vitiate the panel. While it was the duty of the sheriff, as aforesaid, to have summoned said jurors and shown the diligence as to said Richards, yet in our opinion this failure, under the circumstances of this case, is not cause for reversal.

Nor, in our opinion, was there any material error in regard to the action of the court as to the juror Whisenant. The sheriff evidently made a mistake as to having summoned this juror; but certainly his absence should have been discovered by appellant when the list was first called, and he then should have asked an attachment for him. In the view we take of the case, it is not necessary to discuss the questions involved in the motion for continuance.

40th Crim. Reps.—17

Thomas Fulgram was introduced by the State, over the appellant's objection, and permitted to state that he had known Lindeman for eight or ten years in Arizona; that Lindeman had never been charged with a criminal offense during said time, was well thought of, and was a good man. Defendant objected to this testimony, because same was irrelevant to any issue in the case; that, if said testimony was admissible at all as to the character of said Lindeman, only his general reputation could be shown, and not the individual opinion of the witness. We believe appellant's contention as to the opinion of said witness concerning Lindeman being a good man should have been excluded. There was nothing in the case to authorize the testimony as to the good character of said Lindeman, and, if same had been admissible at all, it could only have been proved by his general reputation. As to the first proposition, if there was any issue in the case raised by appellant that Lindeman may have fled in order to escape arrest, in apprehension of some criminal process, then perhaps such testimony may have been admissible. But we do not recall any issue raised by the evidence of this character. The State itself showed that the sheriff informed appellant that he had process for Lindeman from Arizona, and that a reward had been offered for him; but this was shown to be a mere pretext on the part of the sheriff, acting as a detective, and this suggestion was refuted by defendant himself. Under the circumstances of this case, we believe it was only competent for the State to have shown by the witness Fulgram that Lindeman had not, up to the time he (witness) left Arizona, returned to that neighborhood, nor had he heard of him in that community, though he had made inquiries.

By this same witness, Fulgram, the State was permitted to prove, over the objections of appellant, that a certain pipe exhibited to him (and which pipe had been found at the residence of the defendant's mother after the disappearance of the alleged deceased, Lindeman) was the property of the said Lindeman; and thereupon the State was permitted to prove by said witness, upon his original direct examination, that the said Lindeman had told him, while living in Arizona, that said pipe had been given to him by his (said Lindeman's) brother, who was then deceased, and who had been dead quite a number of years. This testimony was objected to by appellant, on the ground that it was hearsay. Mr. Greenleaf (1 Greenleaf on Evidence, section 109) states the rule in regard to declarations as to title, but this appears to concern real estate. In the conclusion, however, of said section, he uses this language: "But no reason is perceived why every declaration accompanying the act of possession, whether in disparagement of the claimant's title or otherwise qualifying his possession, if made in good faith, should not be received as part of the res gestae, leaving its effects to be governed by the other rules of evidence." This would appear to be comprehensive enough to include anything one in possession would say in regard to his title, as to personal property as well as realty. And the note under this section refers to Reg. v. Abraham, 2 Car. & K., 550, in which the following

language is used: "Accordingly it has been held that a statement made by a person not suspected of theft, and before any search made, accounting for his possession of property which he is afterwards charged with having stolen, is admissible in his favor." Here we have the declarations of Lindeman, the alleged deceased, in regard to how he came by a certain pipe in his possession, stating it was a present from his brother. Evidently the, purpose of this testimony was to show that Lindeman would not likely have left Hays County, in the mysterious manner attributed to him by appellant, without taking his pipe with him, as he appears from this testimony to have placed a premium upon it as a keepsake. Unquestonably this character of testimony, coming from original sources, would be competent, and it would be entirely competent to show the acts of Lindeman with reference to this pipe, showing the estimation he placed upon it. Concede the safer rule would be to show this by original testimony, and not by hearsay evidence, still we believe the rule would extend to and include verbal acts showing his estimation of the pipe, when these verbal acts, with reference to his title and possession, were made long anterior to the alleged homicide, so as to indicate an absence of fabrication.

Concerning the testimony of the witness Fulgram as to his acquaintance with certain parties named by him as living in Hays County, and that he was acquainted prior to his removal, while we do not believe there was such attempt made to discredit him as would authorize the production of testimony of his reputation for truth and veracity, yet, under the circumstances of this case, we can see no reasonable objections to this character of evidence. There was some testimony adduced by appellant suggesting that he had registered at San Marcos from Seguin, while he was living in Arizona, and also that he had stated to one of defendant's attorneys that he was an insurance agent. In rebuttal of this character of evidence, we think it was competent for the State to show, as was done, his prior residence at Seguin, and his acquaintance with parties there and in Hays County.

Furthermore, we do not believe that the objection urged by appellant to the testimony of Sheriff Jackman, as to the ruse he practiced on appellant to obtain testimony from him, in connection with the disappearance of Lindeman, was incompetent or improper. The objection urged by appellant to this testimony was that he was at the time under arrest, but the record does not bear out this contention. True, the sheriff states that he would not have let appellant go at that time, and he subsequently did arrest him, but at the time when this conversation occurred there was no suggestion of any arrest. Appellant moved about evidently as he pleased, and, while he accompanied the sheriff into the pasture, he appears to have gone of his own volition. After this, even, the sheriff laid down and went to sleep. If appellant had desired, he could have then gone where he pleased without the sheriff. It was some time after this before he was in fact arrested.

We do not believe it was competent to prove the statements of Lin-

deman, made in the absence of the defendant, to the effect that he had loaned defendant $600 with which to buy cattle; but we believe it was competent to prove by witnesses that Lindeman made inquiries of them, while he was in Hays County, with reference to the purchase of land, as evidencing his intent to remain in that section.

The court in his charge instructed the jury with reference to homicide committed in the perpetration, or attempted perpetration, of robbery, telling them that homicide so committed was murder in the first degree. Appellant objected to this, on the ground that the indictment did not charge murder committed in robbery, or the attempted perpetration of robbery, but merely murder upon express malice; and furthermore, there was no evidence in the case showing that the murder, if any, was committed in the perpetration of, or attempted perpetration of, robbery. The first proposition of appellant is not in accord with the rule established in this State. See Sharpe v. State, 17 Texas Crim. App., 486, followed in Isaacs v. State, 36 Texas Crim. Rep., 505. In appellant's last proposition, he contends that, where such a charge is allowable at all, it must be strictly under our statute defining a technical robbery; that it does not include the mere purpose to claim property after the homicide that may have belonged to the deceased. We agree to this contention, and are inclined to the view that the testimony here did not authorize the charge. We have no evidence in the record with regard to the mode or manner of the homicide, or what was done at that particular time; nor do the circumstances show that appellant was afterwards found with any money of deceased that was in his possession previous to his disappearance. There is some testimony tending to show that he may have had more money after the disappearance of Lindeman than he had before; but in their business arrangements it is entirely consistent with their mode of dealing that the appellant may have had money of Lindeman under his control or possession at the time of the homicide either to purchase cattle, to pay for cattle, or he may have borrowed some from Lindeman. That is, we fail to find in the testimony circumstances tending to show that, if it be true he killed deceased, Lindeman, he took from his person or possession any money. If he had any money that may have belonged to deceased in his possession at the time, and he killed him in order to afterwards assert a claim to this money, we do not understand that to be robbery; that is, a taking from the person or possession property by means of robbery. As to the testimony of the State, which tends to show that appellant laid claim to the interest of Lindeman in the herd of cattle after his disappearance, if he killed him in order to assert title to these cattle, that would not constitute robbery. The cattle appear to have been in the possession of appellant, or, at least, in the joint possession of himself and Lindeman; and it is not pretended that he took said cattle from the person or possession of said Lindeman by means of robbery, but merely that, having killed him, he then laid claim to cattle which were already in his possession. So we are of the opinion that the evidence

did not raise the issue of robbery, or of a killing in the perpetration, or attempted perpetration, of robbery, in this case.

The most important question presented for our consideration is that of the corpus delicti; and it is raised by an assignment of error on the charge of the court, and the refusal of the court to give the requested ·charge, on this subject, and also because it is insisted that the evidence fails to show the corpus delicti. Aside from the court's instruction, which appears to assume that, if Lindeman was killed, he was unlawfully killed, we do not believe that the court's charge was either explicit enough or full enough. On the other hand, we do not believe the requested charge on this subject states the correct rule. Appellant asked the court to instruct the jury "that they must find beyond a reasonable doubt that the portions of bone, hair, etc., found, had been identified by the evidence beyond a reasonable doubt as a portion of Lindeman's remains, independent of any evidence of Lindeman's disappearance, and of any evidence of statements by Gay, or the possession by Gay of money or property claimed by the State to be Lindeman's property. In other words, the death of Lindeman must be proved by the identification of the portions of the bones claimed by the State to be bones of Lindeman, as such in fact, independent of the other evidence in the case, and, without such identification, the defendant could not be convicted, even if he had made an extrajudicial confession to the effect that he had killed Lindeman." This proposition excludes from the consideration of the jury all other evidence whatever tending to identify pieces of bones, hair, etc., found as a part of the remains of Lindeman, save and except such identification as was given by witnesses tending to prove that they recognized said fragments as portions of the remains of deceased. Under this rule in many instances, although the proof might show, in connection with the portions of the remains found and other circumstances of the case, to an absolute certainty and beyond any reasonable doubt, that they were identified as the remains of the deceased, yet a conviction could never follow, because no witness, speaking from the remains alone, would be able to identify them. We concede that the expressions in some of the opinions and the tendency of the decisions in Lightfoot's Case, 20 Texas Criminal Appeals, 77, and Puryear's Case, 28 Texas Criminal Appeals, 73, appear to support the contention of appellant in this respect. But we believe the correct rule is laid down by Judge Gould in Wilson v. State, 41 Texas, 321, and in Kugadt v. State, 38 Texas Criminal Reports, 681. We quote from the latter case as follows: "Now, with reference to the corpus delicti, and recurring to the summary of the facts heretofore stated, we would observe that the rule of law is well settled that, before a conviction can be maintained in any criminal case, the corpus delicti must be established. In a case of culpable homicide, Mr. Wharton says: 'It is essential for a conviction for any degree of culpable homicide—first, the deceased should be shown to have been killed; and, second, this killing should have been proved to have been criminally caused. Unless the corpus delicti in both these respects is proved, a con-

fession is not, by itself, enough to sustain a conviction.' Whart. Hom., sec. 641. See also Hunter v. State, 34 Texas Crim. Rep., 599, and authorities there cited. We would further observe, in this connection, that, before a person can be convicted of felonious homicide, the death of the deceased must be shown to have been caused by the act or agency of such party; and in this State it is enacted by statute that 'no person shall be convicted of any grade of homicide, unless the body of the deceased or portions of it are found and sufficiently identified to establish the fact of the death of the person charged to have been killed.' See Penal Code, 1895, art 654. Now, it will be noted that, while the statute requires that the body of the deceased or portions thereof which are found, must be sufficiently identified to establish the fact of the death of the person alleged to have been killed, yet there is no attempt to indicate the character of testimony by which the identity of the person is to be established. The statute says that the remains must be sufficiently identified; that is, we take it, the statute requires that the proof be of a legal character. Nowhere is it said that the testimony must be positive. If it be circumstantial, that is all that is necessary, if it sufficiently identifies the remains or the portions thereof found as those of the deceased. See Tittle v. State, 35 Texas, 97; Wilson v. State, 41 Texas, 320, 43 Texas, 472; Brown v. State, 1 Texas Crim. App., 154; Jackson v. State, 29 Texas Crim. App., 458; State v. Davidson, 30 Vt., 377; McCulloch v. State, 48 Ind., 109; State v. Williams, 52 N. C., 446, reported in 78 Am. Dec., 248, and note 2, at page 253; Campbell v. People (Ill. Sup.), 42 N. E. Rep., 123; State v. Martin (S. C.), 25 S. E. Rep., 113; Webster v. Com., 5 Cush., 386; 1 Bish. Cr. Proc., sec. 1057 et seq."

In our opinion the court should have fully instructed the jury in accordance with the above, as this was the crucial point in the case. Inasmuch as this case must be remanded for a new trial, we will not discuss the evidence on this question. For the errors discussed, the judgment is reversed, and the cause remanded.

*Reversed and remanded.*

DAVIDSON, Presiding Judge, absent. ·