ALVIN H. KENNEDY V. THE STATE.

No. 23428. Delivered January 29, 1947.
Rehearing Denied March 26, 1947.

*Sam McCollum,* of Brady, and *Gib Calloway,* of Brownwood, for appellant.

*Mark Calloway,* District Attorney, and *J. Edward Johnson,* Special Prosecutor both of Brownwood, and *Ernest S. Goens,* State Attorney, of Austin, for the State.

DAVIDSON, Judge.

For the murder of Rice Willey, his brother-in-law, appellant has been condemned to life imprisonment in the State penitentiary. The bail feature of this case is reported in 190 S. W. (2d) 825.

The questions presented for review render necessary an extended statement of the facts.

Benton Willey died in 1931 and left surviving him his widow, Mrs. Julia Willey, seventy-nine years of age at the time of the trial, and five children, viz, Rice Willey (the deceased), Miss Julia Willey, Jennie Kennedy, wife of appellant, Oma Jay, wife of Bud Jay, and Adelia Ward, wife of Benton Ward. At the time of the death of Benton Willey, he and his family resided upon a one-hundred-sixty-acre tract of land known as the home place, which was community property. Mrs. Willey owned as her separate property two hundred eighty-one acres of land situated about one-half mile from the home place. Deceased, though single, was not living at the home of his parents at the time of his father's death. There is a suggestion in the testimony that he and his father did not get along very well. After the father's death, deceased moved into the home of his mother and took charge of her business. Deceased continued to reside as a tenant upon the home place until his death. Appellant and his family resided as tenants upon the two-hundred-eighty-one-acre tract.

The first difficulty between deceased and appellant arose in 1940 and was brought about relative to terracing of the two hundred eighty-one acres. This difficulty ended in a fist fight in which deceased received a cut in the head. Appellant apologized, but deceased made the statement that he would never forget it. At least a partial reconciliation appears to have been effected. The next difficulty occurred in 1943 or two years before the killing. This arose over the threshing of the rent maize

on the two hundred eighty-one acres. It appears that appellant had a crew threshing his crop and was having the rent threshed at the same time. Deceased appeared and ordered the threshing stopped.

According to the witness Lawson, the deceased, after the threshing had been stopped, made the statement to him that he was going to kill the appellant. About a year thereafter, which would be a year before the killing, Lawson communicated to appellant the threat deceased had made by saying to him, "I have been told that Rice has said he would kill you." In that conversation appellant said to Lawson, "I am going to see to it that Rice don't beat my wife out of her part of the estate."

The witness Woolems testified that about six weeks prior to the killing, he and his wife visited in the home of deceased with the intent of going on a fishing trip; that on that occasion deceased made mention of the relation existing between him and the appellant and that in that connection said, concerning appellant, "Mine and brother's trouble is not all over yet, and when the smoke clears away one of us is not going to be here," and further said, "All my folks have lived to be old." The witness further testified that on that occasion he saw a large revolver and a bottle of whisky in the glove compartment of deceased's car. Two days thereafter, Woolems told appellant what the deceased had said.

Following the threshing incident, deceased quit speaking to the appellant and continued in that attitude until his death.

It was decided by the family that, as a result of the threshing incident, the deceased and appellant should thereafter pay an annual cash rental for the place rented by each. Appellant's rent was fixed at $600.00 and that of the deceased, at $300.00.

Appellant and his wife had lived on the two hundred eighty-one acres for twenty years. It appears to have been generally understood—at least by some members of the family—that, in the event Mrs. Willey decided to sell that tract of land, the appellant and his wife wanted to buy it and that they should have the refusal to purchase. On October 6, 1945, or ten days before the killing, appellant went to Mrs. Willey, the mother, who at the time was living with the daughter, Julia, at Brady, Texas, to see about renting the two hundred eighty-one acres for the year 1946. He was then informed that about a week prior Mrs. Willey had agreed to sell the two hundred eighty-one acres to

the deceased for $47.00 per acre. Upon appellant's inquiring as to why he could not buy it, he was told by Mrs. Willey that "Rice asked for it first," and that she wanted Rice to have the place.

According to the testimony of Julia Willey, this information made appellant angry and he offered Mrs. Willey $10.00 an acre more for the place than deceased had agreed to give. Only Mrs. Willey, and the deceased, and Julia Willey appeared to have known anything about the agreement to sell to deceased. None of the other children appear to have been consulted. Julia Willey further testified that appellant on this occasion said, "Many tears would be shed," and "It would not turn out like we had planned it," and "Well, I suppose there is nothing left for me to do, but to go out there and see that he does not get it."

It was undisputed that an oil well had been discovered about one-half mile from the two hundred eighty-one acres. The agreement to sell to deceased included all the minerals, while appellant's offer of $57.00 per acre was for the surface estate only—the minerals to be retained by Mrs. Willey. Regardless of this difference in price, appellant's offer was refused and he was placed upon notice that he would have to relinquish possession of the two hundred eighty-one acres.

Appellant and his wife then began an endeavor to buy the one-hundred-sixty acre home place, where deceased resided. To convey that property, all the children were required to sign the deed. Deceased refused to sell or consider the proposition of selling that place to his sister, Mrs. Kennedy. Appellant and his wife were facing the problem of finding some place upon which to live.

Such was the condition existing when, on October 15, 1945—the day before the killing—Mrs. Kennedy happened to meet the deceased in the road near their home. According to the testimony of Mrs. Kennedy, she stopped him and engaged him in the first conversation they had had for two years. In the course of this conversation she pressed upon deceased the proposition that if he was going to buy the two-hundred-eighty-one-acre place, she wanted to buy the home place of one hundred sixty acres and that if she did not succeed in getting that place it was going to be difficult for them to find a place to live. Deceased again refused to sell them that place, saying, "Well, I will not sell Alvin the place for I don't want him around here," to which Mrs. Kennedy replied, "We can leave Alvin out of it, I want the place

myself, and just leave Alvin out of it." To this, deceased replied, "I will leave him out; the first time I see him, I will take my forty-five and kill the son of a bitch, and then he will be out of it." With this statement the conversation ended. The threat deceased made to kill appellant the first time he saw him was communicated by Mrs. Kennedy to her husband that night. Such was the condition existing up to the time of the homicide.

It was the State's position, supported by the testimony that appellant, knowing the deceased—who was working at a peanut thresher—would be traveling in his car along a certain road, stationed himself thereon at a point opposite a gate or gap leading into a pasture under the control of appellant, and there waited for deceased to approach; that when deceased drove by, he shot him in the back of the head with a high-powered rifle, killing him instantly.

Appellant, testifying as a witness in his own behalf, denied prior knowledge that deceased was at the peanut thresher or that he would be traveling along the road where he had gone to repair the fence or gap into his pasture; that as deceased approached him he made a demonstration towards the glove compartment which caused appellant to believe that he was reaching for a gun with which to carry into execution the threat he had made the day before to appellant's wife as well as other threats communicated and uncommunicated relative to which appellant testified; and that he fired solely and only in self-defense.

According to the State's testimony, the killing was deliberate with malice, and accomplished by lying in wait.

According to appellant's testimony, the killing was justified upon threats and was in self-defense against apparent danger and the acts and conduct of the deceased toward appellant, and the circumstances and relations existing were such that the killing was not upon malice aforethought.

Appellant filed an application for a suspension of sentence.

Witnesses attested his good reputation for being a quiet, peaceable, inoffensive, and law-abiding citizen and also his good reputation for truth and veracity. Witnesses attested the good reputation of deceased for being a peaceable and law-abiding citizen. Whether he was a person likely to carry into execution any threat he might make was not gone into.

The witness H. D. Bradley, upon direct examination, testified to appellant's good reputation for being a peaceable and law-abiding citizen. Upon cross-examination, the State inquired of the witness as to whether he had heard of appellant having had a fight with the deceased and others—some of which incidents the witness had heard of and others he had not. Witness was then asked, "Mr. Bradley, did you hear any—had you heard anything before this occurrence of Alvin Kennedy having illicit relationship with any woman out there?" Appellant objected to the question because it had no bearing upon the trait of appellant's character as a peaceable and law-abiding citizen and was highly prejudicial and inflammatory. The objection was overruled, whereupon witness asked State's counsel to repeat the question—which he did, in the following language, "Had you heard anything about him having illicit relations with a woman in that neighborhood?"—to which witness replied, "I had not."

The trial court's qualification to the bill of exception (No. 6) presenting this matter shows that he allowed the question to be asked because the witness had attested appellant's good reputation as a peaceable and law-abiding citizen.

There is no question but that a character witness who attests the good reputation of an accused may be asked upon cross-examination whether he had heard of rumors or particular charges of acts of accused inconsistent with the trait of character the witness is called upon to prove. Such testimony is allowed not to establish the truth of such charges but to test the sincerity of the witness and to enable the jury to weigh his evidence. McClure v. State, 136 Tex. Cr. R. 312, 124 S. W. (2d) 1007; Adaire v. State, 119 Tex. Cr. 381, 45 S. W. (2d) 984; Kimbrell v. State, 115 Tex. Cr. R. 593, 27 S. W. (2d) 213; 44 Tex. Jur., p. 1168, Sec. 161, Note 18, and authorities there cited.

Appellant recognizes the correctness of the rule stated and also that the question propounded related to whether or not witness had heard of the alleged misconduct rather than whether or not he knew of such alleged conduct as a fact. He insists that the vice in the question propounded lies, however, in the fact that the misconduct inquired about was not inconsistent with the trait of character he had put in issue. In other words, it is appellant's contention that as there was placed in evidence only his reputation as a peaceable and law-abiding citizen, the fact that he had or that witness had heard of illicit relations by him with women in the neighborhood was not inconsistent with

that reputation. Appellant had not placed in issue his reputation as a man of good morals or of good moral character.

Crimes, offenses, acts, and conduct other than, outside of, and extraneous to the offense charged are provable against an accused only when they come within some exception to the rule stated. We know of no exception whereby the State was authorized in this case to prove directly or indirectly or by some suggestion or innuendo that the appellant was or might have been guilty of illicit relations with a woman. When the interrogatory was propounded to the witness, appellant had to pursue one of two courses—either to sit by and not object thereto, thereby permitting the innuendo cast by the interrogatory to go unchallenged, or to object thereto and be placed in the attitude before the jury that he was afraid of the answer. He chose to object. The fact that the witness answered that he had not heard of such illicit relations upon appellant's part did not change appellant's attitude before the jury. The vice lay in the interrogatory and the innuendo cast thereby. We are constrained to agree with the appellant that it was not error to propound the interrogatory to the witness.

To impeach, as well as counteract, the testimony of the witness Woolems as to a threat the deceased made against appellant and as to his seeing a pistol in the glove compartment of deceased's automobile upon the occasion of his visit to the home of deceased, the State proved by Mrs. Willey, wife of the deceased, as a separate and independent fact, that when Woolems arrived at their home that day he was drunk and had whisky in his possession.   ,

To proof of the fact that witness was drunk on that occasion appellant objected because it was irrelevant and prejudicial. The matter is presented here by Bill of Exception No. 9.

Ordinarily, a material witness may not be impeached upon immaterial matter (Branch's P. C., Sec. 165) or by proof of other and extraneous offenses not amounting to the grade of a felony or a misdemeanor involving moral turpitude (Branch's P. C., Sec. 168).

The State insists that proof of the fact that Woolems was drunk was permissible under a well-established exception to the rules stated—which is that for the purpose of testing the memory of a witness and his capacity for correct observation and to affect the weight of his testimony, it may be shown that

he was drunk when the matter about which he testifies occurred—as shown by Branch's P. C., Sec. 43; McCarty v. State, 107 Tex. Cr. R. 589, 298 S. W. 575; Smith v. State, 121 Tex. Cr. R. 231, 51 S. W. (2d) 686.

An application of the exception depends upon the fact that the drunkenness or drunken condition of the witness was coexistent, in point of time, with the matter about which he testifies. The State, having offered proof of the fact that Woolems was drunk—as within the exception noted—was under the burden to so show.

Looking to the testimony of the witness Woolems as to the time and place when deceased made the threat and he saw the pistol, we find that he testified as follows:

"We went to Rice Willey's house with the intention of going fishing. We got there at their house about twelve o'clock and sat around and talked awhile, and then Rice and I left to get some fishing tackle * * *."

It was while the witness and deceased were gone to get the tackle that Woolems claims the threat was made. It was later the same afternoon that he claims to have seen the pistol. According to Woolems, only he and deceased were present at either time.

Mrs. Willey testified that Woolems was drunk when he came to their home. She does not say, with reference to his arrival, when Woolems and deceased left to go get the fishing tackle, nor does she say that Woolems was drunk when he left the house or when he returned, or how long he and deceased were gone. She does say, "They were there at our house I imagine about three hours."

Ultimately, then, to authorize proof that Woolems was drunk at the time he claims the threat was made by deceased and that he saw the pistol in the glove compartment of the car, the State relies upon the fact that some time prior thereto, and not less than three hours, he was in that condition. In other words, it is the State's position that proof of the fact that Woolems was drunk when he came to the home of deceased constitutes proof that he was in the same condition some time not less than three hours thereafter.

We are unwilling to indulge such a presumption in the in-

stant case. Here, we are dealing not with the application of some general rule nor with testimony ordinarily and generally admissible but rather with testimony that is ordinarily inadmissible and which becomes admissible only under some special exception to a general rule. Woolems gave material testimony in behalf of the appellant. If his testimony was to be impeached before the jury by testimony not ordinarily admissible for that purpose, it should come clearly within the exception relied upon to render it admissible. Under the facts and circumstances here shown, we are unable to reach the conclusion that proof that Woolems was drunk when he arrived at the home of deceased was admissible.

Throughout appellant's defensive testimony the idea was manifested that deceased had overreached his mother in buying the two-hundred-eighty-one-acre tract for considerably less than its value and that she was under his influence; that on account of this influence and his control of her business, he wanted to reduce the two hundred eighty-one acres to money and thereby serve his own interest as well as to prevent his sisters, Mrs. Kennedy and Mrs. Ward, from eventually realizing anything out of this property.

Both appellant and Benton Ward, the husband of Adelia Ward, openly charged in their testimony that they believed it was the intent of deceased to beat those two sisters out of any part of their mother's estate. There was also the suggestion that deceased had made use of the management of his mother's business to further his own private interest.

To counteract these influences as well as testimony, the State called Mrs. Willey, the mother, as a witness in rebuttal. Upon direct examination she was asked, "Mrs. Wiley, how was Rice's attitude toward you; was he good to you or mean to you?"

To this question appellant's counsel objected, as follows: "We object to that, as calling for her conclusion; we have no objection to her stating the facts."

The objection was overruled, and the witness testified, "No, sir, he was not mean to me."

Witness was then asked, "Was he good to you?"—to which witness replied, "Yes, sir, I think he was a good boy, an average good boy."

Appellant again urged his objection to the testimony because it was a conclusion of the witness.

Appellant, in his brief as also his oral argument, here urges that the testimony of the witness as to the deceased being "a good boy, an average good boy" was indamissible, not only as being a conclusion of the witness but as proof of the individual view of the witness as to the character of the deceased.

It will be noted that the answer of the witness as to deceased being a good boy was not responsive to the question asked, which was "Was he good to you?" Appellant should have moved to strike the testimony rather than to have relied upon his objection to the question asked.

In view of the fact that the case is to be reversed upon other grounds, we deem it advisable, in view of another trial, to discuss the question that appellant seeks to here present, which is, "Was the witness authorized to testify that the deceased was a good boy?"

It is the general and well-established rule that the only way to make proof of a person's character is by proof of his general reputation with reference to the particular trait which is under consideration. The reputation a person bears is a fact and may be testified to as such. A person's character, being an inner quality, is not susceptible to proof, as such. 19 Tex. Jur., p. 387, Sec. 248. It follows, then, that as a general rule, a witness will not be permitted to express his individual views as to a person's character. 19 Tex. Jur., p. 388, Sec. 249.

Following this rule in Spangler v. State, 41 Tex. Cr. R. 424, 55 S. W. 326, this court held that in a homicide case the actual character of the victim is not admissible. In Gay v. State, 40 Tex. Cr. R. 242, 49 S. W. 612-615, a witness in a murder case was permitted to testify that the deceased was a good man. This was held to be inadmissible because the good character of the deceased can be established only by his general reputation.

It appears, therefore, that under the rule stated, the witness would not be authorized to express her individual view as to the character of the deceased.

By Bills of Exception Nos. 4 and 5, appellant claims that his wife was, upon cross-examination, interrogated relative to matters not gone into or covered in her examination-in-chief.

The testimony complained of in each bill was withdrawn from the jury's consideration by the trial court. The testimony was not of such a character that it could not be effectually withdrawn from the jury's consideration.

The remaining bills of exception have been examined and are overruled without discussion.

For the errors pointed out, the judgment of the trial court is reversed and the cause remanded.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

ON MOTION FOR REHEARING.

GRAVES, Judge.

The State's attorneys have filed a motion herein alleging that we were in error in our reversal and insisting that they were well within their rights and the law in propounding to the witness the question complained of in Bill of Exceptions No. 6 as follows:

"Q. Had you heard, Mr. Bradley, before this occurrence, of the defendant having some illicit relationship with a neighbor woman out there? A. I had not.

"MR. McCOLLUM: I object to that and we want a bill of exception to the district attorney making inquiry into a matter like that; that might be very inflammatory, and any question of that character we want a bill of exception to it.

"COURT: I sustain the objection, and Gentlemen of the Jury, do not consider that question for any purpose.

"MR. McCOLLUM: We want the bill on it even though the court has given that instruction to the jury.

"Q. Mr. Bradley, did you hear any—had you heard anything before this occurrence of Alvin Kennedy having illicit relationship with any woman out there?

"MR. GIB CALLAWAY: "We thought the court had excluded such questions; we object to it; it has no bearing on the question of the defendant's reputation for being a peaceable, law-abiding and of being an inoffensive disposition; and that is all that is material, and such questions as that are highly inflammatory and prejudicial.

"COURT: I overrule the objection.

MR. GIB CALLAWAY: Please note our exception. A. Will you ask it again.

"Q. Had you heard anything about him having illicit relations with a woman in that neighborhood? A. I had not."

The trial court qualified this bill with the following statement:

"This witness had testified on direct examination that the general reputation of the defendant in that community as to being a quiet, peaceable and law-abiding citizen, was good."

It will be noted that when this question was first propounded to the wintess, the careful trial court sustained an objection thereto and immediately thereafter practically the same question was again propounded. It is also worthy of note that no other character witness of appellant was asked this question or one similar thereto.

Webster defines "illicit" to mean "not permitted or allowed; improper; unlawful." Evidently the phrase "illicit relations", as used in this question, referred to and meant unlawful sexual relations with some woman; and on account of the marital status of appellant, if such relations were habitual, the same would constitute adultery as denounced by Art. 499, P. C. However, the decisions seem to have been rather stringent in construing the word "habitual", although no hard and fast rule has been laid down relative thereto. Proof of occasional acts are not sufficient to show habitual intercourse. See Hafley v. State, 88 Tex. Cr. R. 51, 224, S. W. 1099; Reynolds v. State, 100 Tex. Cr. R. 508, 271 S. W. 907; Cordill v. State, 83 Tex. Cr. R. 74, 201 S. W. 181. While such occasional relations would doubtless offend against the moral law, the inference that such did thus offend is plainly seen from the repeated question. The statutory law does not thus denounce such as an act contrary to the statute. Therefore, we think our original opinion was correct in its holding that a rumor relative to such relations would not be admissible as a test of the credibility of a witness who had given testimony that appellant's reputation for being law-abiding was good.

Relative to Bill of Exception No. 10, it is shown that the members of the Willey family, consisting of two older girls, one boy and two younger girls, were having some family differ-

ences. The deceased, the only boy, was living at the home place and was practically in charge of the mother's business, she being very old, and to some extent under the domination of the deceased. He had recently obtained from her an option to purchase the tract rented to appellant for a consideration of $47.50 per acre with no reservation of the minerals to the mother. Appellant, upon ascertaining this, offered $57.50, and the mother was to retain the minerals under such land, which offer was rejected. The main cause of discord in the family was the favoritism shown the deceased. Under such circumstances the mother was placed on the stand and, over appellant's objections, was allowed to testify as follows:

"Q. Mrs. Willey, how was Rice's attitude toward you; was he good to you or mean to you?

"MR. CALLAWAY: We object to that as calling for her conclusion; we have no objection to her stating the facts.

"COURT: The objection is overruled.

"MR. CALLAWAY: Note our exception.

"Q. How about it, Mrs. Wiley? A. No, sir, he was not mean to me.

"Q. Was he good to you? A. Yes, sir, I think he was a good boy, an average good boy.

"MR. CALLAWAY: We want our exception to this as being merely a conclusion of the witness."

We think this statement was a conclusion of the witness, was damaging to appellant, and should not have been allowed. The facts as to the deceased's treatment of his mother could have been drawn from her by the State as pertinent, but the conclusion relative thereto was but an opinion, and the jury should have, after hearing the facts, been allowed to draw their own conclusion therefrom.

Bill of Exception No. 3 complains of the following procedure: After the State had finished placing its testimony on the stand, one of appellant's attorneyes made a statement before the jury relative to the facts expected to be proved by the defendant. At the conclusion of such statement the trial court voluntarily stated to the jury:

"Gentlemen of the Jury: Of course, you will not consider the statements of counsel as being any evidence in this case; but merely as a statement of what he intends to prove."

To which counsel for appellant excepted for the reason "that the law authorized such statement by the defense counsel to be made, and that the remarks of the court were oral instructions to the jury and prejudicial to the rights of the defendant." The privilege of making such statement is a valuable right provided by statute (Art. 642, sub. 5, C. C. P.), and if denied, would constitute error. See Hooper v. State, 100 Tex. Cr. R. 147, 272 S. W. 493; Brown v. State, 90 Tex. Cr. R. 231, 234 S. W. 390; Dugan v. State, 82 Tex. Cr. R. 422, 199 S. W. 616. Of course, this statement should follow the statutory privilege, and the trial court should control the same, holding it within such terms.

Subdivision 5 of Article 642, C. C. P., reads as follows:

"The nature of the defenses relied upon and the facts expected to be proved in their support shall be stated by defendant's counsel.

In the present bill, it is not shown what such counsel had stated to the jury that called for the oral instruction of the court. Verbal charges to the jury are not allowed in felony cases. Art. 663, C. C. P. Under Art. 658, C. C. P., the court should set forth in writing the law applicable to the case, "not expressing any opinion as to the weight of the evidence, not summing up the testimony, discussing the facts, or using any argument in his charge calculated to arouse the sympathy or excite the passions of the jury." It would have been the better practice for the trial court to have made no comment upon the exercise of appellant's right to make such statement to the jury at the proper time, provided, of course, that appellant's attorney had made it plain in such statement that such were the facts he *expected to prove*. If such was not made plain, then the trial court had the right and duty to hold such a statement within the provisions of Art. 642, supra.

This cause has been carefully scrutinized by all the members of this court, who think the original opinion herein was correct in its reversal, and the motion for a rehearing will therefore be overruled.

HAWKINS, Presiding Judge, absent.