UNITED STATES of America

v.

Conrad FOX, Appellant.

No. 71–1613.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 12, 1972.

Decided Nov. 14, 1972.

Mr. Eugene L. Stewart, Washington, D. C. (appointed by this court), for appellant.

Mr. Robert D. Zsalman, Asst. U. S. Atty., with whom Messrs. Harold H. Titus, Jr., U. S. Atty., John A. Terry, Asst. U. S. Atty., and Roger E. Zuckerman, Asst. U. S. Atty. at the time the brief was filed, were on the brief, for appellee. Mr. Thomas A. Flannery, U. S. Atty. at the time the record was filed, also entered an appearance for appellee.

Before BAZELON, Chief Judge, and WRIGHT and ROBINSON, Circuit Judges.

J. SKELLY WRIGHT, Circuit Judge:

Appellant Conrad A. Fox seeks reversal of his conviction of armed robbery [1] and assault with a dangerous weapon [2] on essentially four grounds. First he asserts that prejudicial error was committed when the District Court ruled that the Government could ask a defense character witness questions concerning Fox's arrest for rape. Second Fox claims that reversal is compelled because the prosecution's main witness was permitted to testify that she had identified Fox at a pretrial lineup where he was allegedly not represented by counsel. Third Fox argues that, even apart from the question whether he had representation at the lineup, the lineup was arranged in such a suggestive fashion that his right to due process was violated and testimony concerning the lineup should have been excluded for that reason. Finally Fox argues that his in-court identification was so tainted by the lineup identification that it should have been excluded as well.

In Part II of this opinion we show that the trial court's ruling concerning the allowable scope of cross-examination of the character witness was erroneous. As a result of that ruling Fox's trial attorney did not offer the witness. Since the trial centered around a conflict of testimony and credibility among Fox, three alibi witnesses, and the victim of the robbery, the District Court's ruling and its by-product—trial counsel's understandable reluctance to offer the character witness—were clearly not harmless. Thus we are compelled to reverse Fox's conviction and to remand the case to the District Court for new proceedings. In any new trial that is held, witnesses attesting to Fox's reputation in his community for truth and veracity, the quality concerning which the character witness was to testify, may not be cross-examined about Fox's arrest for rape. On remand prior to trial, the District Court should hold a hearing to develop the facts and to make findings concerning the presence or absence of counsel at the lineup [3] as well as its suggestiveness. If the evidence indicates substitute counsel represented Fox at the lineup, the District Court's findings should make clear the circumstances surrounding his appointment and the adequacy of his representation. [4]

1. 22 D.C.Code §§ 2901, 3202 (Supp. V 1972).

2. 22 D.C.Code § 502 (1967).

3. The question whether Fox was represented by counsel at the lineup was not expressly raised by Fox's attorney prior to the trial and the District Court made no finding in this respect. But the right to counsel question was implicitly raised at the pretrial hearing when Fox's attorney indicated that she lacked notes of what had occurred at the lineup. Tr. 23–24. In any event, because of the importance of the right at stake we are not precluded from considering this question on appeal and directing its determination on remand even though it may not have been clearly raised at the trial level. See Solomon v. United States, 133 U.S.App.D.C. 103, 106, 408 F.2d 1306, 1309 (1969).

4. If the District Court finds that substitute counsel was present at the lineup, we believe his recollections and any notes he might have taken will be of considerable value in the inquiry into the lineup's suggestiveness. In the event the District Court finds that substitute counsel is unable to assist Fox's trial counsel in illuminating the issues regarding Fox's lineup identification, then a serious question is raised whether Fox's 6th Amendment rights under United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149

## I

The only eyewitness against Fox was Mrs. Annie F. Howard, the counter clerk at Stanley's Cleaners, 424 15th Street, N.E., Washington, D.C., at the time of the robbery. She testified that at approximately 12:30 P.M. on October 14, 1970, appellant entered the cleaning store with a pair of pants over his arm. After Mrs. Howard had written up a ticket-receipt for the pants, the customer, who used the name "Brooks," asked her to look for some pants he said he had deposited under that name for laundering the previous November. When Mrs. Howard indicated her surprise at the lengthy time lag, the customer quickly said, "No, I mean May." Mrs. Howard then went to the conveyor belt to look for pants under the name "Brooks." Unsuccessful, she returned to the counter. The customer, now holding a silver-finished hand gun, told her to open the cash register. After Mrs. Howard complied the customer reached in, removed approximately $12 to $15, and then left the store with the pants he had brought in and the ticket Mrs. Howard had written out. The intruder tore up the ticket and discarded it as he left the store. Mrs. Howard testified that the intruder was in the cleaning shop for approximately six to eight minutes, that the lighting was bright, and that she had a good opportunity to observe his features.

Mrs. Howard also testified that while she was looking for the pants the customer had asked about she recalled thinking she knew the customer from another Stanley's Cleaners shop at 23 15th Street, N.E., where she had worked previously. Although she did not at the time recall the customer's name, she testified that she knew at the time of the robbery that his name was not Brooks.

William Stanley, Sr., her employer, testified that Fox had been a customer of the "No. 23" store and that he knew the Fox family.

Mrs. Howard also testified at trial to her participation in pretrial identification proceedings which led to Fox's arrest and indictment. On the day of the holdup she gave Detective Michael Guarneiri of the Metropolitan Police Department a description of the intruder: that he was black, of medium height and build, that he had a "medium-type bush" haircut, and that he wore a floral print shirt and dark pants. Detective Guarneiri indicated that Mrs. Howard's initial description was somewhat more specific: that she said the intruder was approximately five feet, seven inches tall, weighed between 130 and 140 pounds, was in his late teens or early 20's, dark complexioned, and had large almond-shaped eyes. Later on the day of the robbery, Mrs. Howard went to the headquarters of the Robbery Squad where, at Detective Guarneiri's behest, she looked through approximately 100 photographs. At this time she made no positive identification, although she said that one of the pictures, while not that of the intruder, bore a close resemblance to him. The only other evidence the police received the day of the robbery was the sales slip written out to "Brooks" before the robbery. Neither the ticket the robber discarded nor the countertop which he was said to have touched was fingerprinted. 

Fox was not identified until November 5, when Detective Guarneiri went to the cleaning shop and showed Mrs. Howard 10 photographs. After looking at them one at a time, she positively identified either the fourth or the fifth as that of the robber.[5] On November 14

(1967), were effectively protected. See Marshall v. United States, 141 U.S.App. D.C. 1, 6 n. 18, 436 F.2d 155, 160 n. 18 (1970). *Compare* United States v. Smallwood, 153 U.S.App.D.C. ——, 473 F.2d 98 (No. 71–1283, decided Nov. 9, 1972).

5. Fox does not challenge the photographic identification Mrs. Howard made on Nov. 5 on either 6th Amendment right to counsel grounds or on the ground that the exhibit of photographs was so suggestive as to violate due process.

Fox was arrested and charges were filed accusing him of the holdup. Mrs. Howard picked Fox out as the robber from a 10-man lineup held on November 19. At trial she testified to both the photographic and the lineup identifications.

Opposing Mrs. Howard's testimony—her recollections of the robbery, her recollections of subsequent photographic and lineup identifications, and her courtroom identification of Fox—were Fox himself, who took the stand, and three alibi witnesses. Fox testified that he spent virtually the entire day of October 14, from approximately 8:30 A.M. to the evening when he attended a concert, at the home of his girl friend, Cheryl Thomas. Fox and Miss Thomas each testified that they left her home for approximately 45 minutes around noon to get a carry-out lunch from a nearby McDonald's. Fox testified that they returned some time between noon and 12:30 P.M., and Miss Thomas recalled the time of their return to her house as 12:30 P.M. Two of Miss Thomas' friends, Della Russell and Vaughnetta Paige, testified that together they visited Miss Thomas at her home that afternoon and that Fox was present. Miss Russell said they arrived at 12:05 P.M. and Miss Paige said their time of arrival was 12:25 P.M. But both agreed that Fox was at the Thomas home at 12:30 P.M., the alleged time of the robbery.

Since the trial consisted in large part of the conflicting testimony of Mrs. Howard and Fox, backed by his alibi witnesses, the Government's attorney sharply attacked the alibi witnesses' testimony for its inconsistencies and for its allegedly memorized quality. The prosecutor then pointed out that the jury's main task was to assess the credibility of Fox and his supporting witnesses as against Mrs. Howard's recollection and identifications. Yet on the vital issue of his credibility, because of an erroneous ruling by the District Court Fox was unable to present character witnesses attesting to his reputation in the community for truth and veracity. Before the trial began, the District Court ruled that the proposed character witness for Fox—a Roman Catholic nun who knew him from his place of employment—could be asked on cross-examination whether she had heard of Fox's arrest for rape that was alleged to have occurred between his arrest and trial.

## II

Our criminal law theory rejects the concept of "good men" and "bad men." The primary article of faith of our criminal law is that before a man can be stigmatized as a criminal he must be charged with, and proved guilty of committing, a specific criminal act. His general predisposition toward crime or bad reputation cannot be used against him at his trial.[6] The defendant himself, however, may, if he chooses, offer evidence of his good character by presenting witnesses attesting to his reputation in his community.[7] In some circumstances that evidence in itself may be sufficient to raise a reasonable doubt as to his guilt and the jury must

---

There is some dispute over whether Mrs. Howard identified the 4th or the 5th photograph. She testified that she was not sure in which of the 2 places in the packet of 10 shown to her by Detective Guarneiri the protograph of the intruder was located. Tr. 9. Detective Guarneiri, on the other hand, testified that it was positively the 5th photograph. Tr. 102. The importance of this conflict is that one of appellant's claims is that the lineup was unnecessarily suggestive because Fox wore a placard with the number 5 around his neck.

Since we have no occasion to reach a conclusion regarding the due process at-

tack on the lineup, this possible correlation, if proved, may be considered by the District Court on remand, not as necessarily determinative in itself, but as one circumstance which, when added to other possibly suggestive circumstances surrounding the lineup, might suggest a conclusion of impermissible suggestiveness.

6. *See* Michelson v. United States, 335 U.S. 469, 475–476, 69 S.Ct. 213, 93 L.Ed. 168 (1948).

7. *See id.* at 477, 69 S.Ct. 213, 93 L.Ed. 168.

be so instructed.[8] Moreover, a defendant in offering evidence of good character may limit that evidence to a specific character trait. Rather than offer evidence of his general reputation as a law-abiding citizen, for example, the defendant may, as appellant did here, limit his offer to the specific trait of truth and veracity. And when the defendant so limits his offer, the prosecution is likewise limited in its response.[9] Otherwise evidence of general disposition to commit crime could be introduced, through cross-examination or in rebuttal, and the defendant might be convicted of being a "bad man" in the eyes of the jury rather than of the crime for which he is on trial.

Our jurisprudence makes this principle very clear. In Michelson v. United States, 335 U.S. 469, 69 S.Ct. 213, 93 L. Ed. 168 (1948), the Supreme Court surveyed the law of character evidence and, with respect to the question of the scope permitted the prosecution in cross-examining character witnesses for the defense, stated that it is "by comparison with the reputation asserted that a court may judge whether the prior arrest should be made subject of inquiry." *Id.* at 484, 69 S.Ct. at 222. In United States v. Wooden, 137 U.S.App.D.C. 1, 2–3, 420 F.2d 251, 252–253 (1969), Judge Robb, writing for our court, stated:

> " * * * The impeaching questions must be tested 'by comparison with the reputation asserted' [citing *Michelson, supra*], and care must be taken to exclude questions which merely tend to traduce and besmirch the defendant, while having no substantial impact on the credibility of the witness. * * *"

And in Shimon v. United States, 122 U.S.App.D.C. 152, 156, 352 F.2d 449, 453 (1965), Mr. Chief Justice (then Judge) Burger wrote for our court:

> " * * * The prosecution may reply with other hearsay which may embrace rumors—true or false—that the Defendant's reputation *for the trait put in issue* is not good. * * *"

(Emphasis added.) In the same case Mr. Chief Justice Burger went on to say:

> " * * * To accomplish the legitimate objectives of impeachment in this case it was a simple matter to limit the questions to the issue tendered, *i.e.,* Appellant's reputation for veracity, without making reference to the specific wiretapping episodes. The wiretapping activities attributed to Appellant in the questions did not go to Appellant's reputation for truth and honesty * * *."

122 U.S.App.D.C. at 157, 352 F.2d at 454.

■ The trial court here ruled that a character witness whose testimony is limited to the defendant's reputation for truth and veracity may be cross-examined about an alleged arrest of the defendant for rape. This was error and the error was not harmless because it denied the defendant his right to character testimony which might have raised a reasonable doubt as to his guilt in the minds of the jurors.[10] There is no obvious relationship between rape and veracity. These characteristics are related only in the sense that "bad men" might be more likely than "good men" to lie as well as to rape. In addition to introducing the reprobated "bad man—good man" dichotomy into the criminal trial,

---

8. *See id.* at 476, 69 S.Ct. 213; Edgington v. United States, 164 U.S. 361, 366–367, 17 S.Ct. 72, 41 L.Ed. 467 (1896).

9. *See* United States v. Wooden, 137 U.S. App.D.C. 1, 420 F.2d 251 (1969); Aaron v. United States, 5 Cir., 397 F.2d 584 (1968); Shimon v. United States, 122 U.S.App.D.C. 152, 352 F.2d 449 (1965); People v. Marsh, 58 Cal.2d 732, 26 Cal. Rptr. 300, 376 P.2d 300 (1962); Albertson v. Commonwealth, 312 Ky. 68, 226

S.W.2d 523 (1950); Kennedy v. State, 150 Tex.Cr. 215, 200 S.W.2d 400 (1947).

10. The primary evidence against appellant consisted of one eyewitness. Appellant was not identified or arrested until several weeks after the crime. He testified to a reasonable alibi and his testimony was supported by several witnesses. If the nun had testified as to his reputation for truth and veracity, the jury might well have accepted appellant's testimony.

the relationship between rape and veracity is tenuous at best. Any possible probative value the evidence of the defendant's alleged arrest for rape might have is far outweighed by the prejudice it introduces to blight the jury's deliberations. *See* Wooden v. United States, *supra;* Shimon v. United States, *supra;* 3A J. Wigmore, Evidence § 988, at 921 (Chadbourn rev. 1970); C. McCormick, Evidence 454–456 & n. 73 (Cleary ed. 1972).

■■ The Government's rejoinder to the application of this well settled rule is to rely on Young v. United States, D.C.Cir., No. 20,269, decided April 14, 1967. There a panel of this court, in a brief unreported[11] *per curiam* opinion, upheld a District Court ruling allowing the prosecution to ask a defendant on cross-examination in a trial for housebreaking and larceny questions concerning a prior conviction of assault with intent to commit carnal knowledge. We believe the *Young* case is completely inapposite to the question before us because, as *Michelson* makes clear, the evidentiary rules for testing the credibility of the defendant and his character witness in a criminal case are simply not the same.

■■ Where the defendant is on the stand, the prosecution may attack his credibility—the likelihood that he is truthfully relating events concerning which he is conceded to have knowledge —by introducing evidence through cross-examination, or otherwise if necessary, about prior felony convictions or misdemeanor convictions for crimes involving dishonesty or false statement. 14 D.C.Code § 305(b)(1) (Supp. V 1972). Such evidence may be introduced on the theory that a demonstrated willingness to commit some kinds of crime may well indicate a willingness to lie on the witness stand.[12] But evidence

of arrests, without more, demonstrates no such willingness and, consequently, may not be introduced for the purpose of testing the credibility of the defendant directly or indirectly through his character witness. Michelson v. United States, *supra,* 335 U.S. at 482, 69 S.Ct. 213, 93 L.Ed. 168. Of course, the prosecutor may test the credibility of a character witness with questions relating to the witness' *own* past history. More pertinent to this case, cross-examination may test whether the character witness is *qualified* to serve his function of providing an adequate report of the community's sentiments regarding the character trait of the defendant at issue. For this purpose questions regarding a defendant's arrests may be proper, but the limitations laid out in the *Michelson, Shimon* and *Wooden* cases discussed earlier must be observed.

Reversed and remanded with instructions.

---

11. The Government's brief in this case was filed before this court announced its rule that our unreported opinions may not be cited as authority since they have no precedential value.

12. *See* H.R.Rep.No.91–907, 91st Cong., 2d Sess., 62 (1970).