**Gregory L. CURRY, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 84–317.**

District of Columbia Court of Appeals.

Argued Nov. 27, 1984.

Decided Sept. 9, 1985.

---

G. Allen Dale, Washington, D.C., for appellant.

John M. Facciola, Washington, D.C., with whom Joseph D. diGenova, U.S. Atty., and Michael W. Farrell, and Kathleen E. Voelker, Asst. U.S. Attys., Washington, D.C., were on brief, for appellee.

Before FERREN, BELSON and ROGERS, Associate Judges.

ROGERS, Associate Judge:

Appellant was convicted by a jury of rape, D.C.Code § 22–2801 (1981), carnal knowledge, *id.*, and enticing a minor child,

*id.* § 22–3501.[1] In a post-trial motion, he asked for a new trial on the grounds of ineffective assistance of counsel, and the trial court's failure, *sua sponte*, to instruct the jury on corroboration of the complainant's testimony. After a hearing, the trial judge denied the motion. According appropriate deference to the findings of the trial court, we hold that the failure to instruct on corroboration was harmless error. We also hold that although trial counsel's conduct during the trial was not exemplary, the most questionable being failure to investigate available medical evidence which left undeveloped explanations bearing on the complainant's credibility, appellant was not so prejudiced as to violate his Sixth Amendment right to effective counsel. Accordingly, we affirm.

## I

The charges arose from allegations that appellant raped an eleven year old female on December 21, 1980, and again on September 14, 1982. At trial, appellant denied the 1980 charges and presented an alibi defense to the 1982 charges. A jury found him not guilty of all the 1982 charges, but guilty of rape, carnal knowledge, and enticing a minor child on December 21, 1980.

At trial, the complainant testified that appellant, her mother's ex-boyfriend, had raped her at his apartment on December 21, 1980. She bled so profusely that upon arriving home, her mother and appellant took her to the hospital where she received 48 stitches in her vagina, and remained for two days. She claimed that because she feared appellant, who is 6'6" and 290 pounds, she had told her mother and the examining physician that the injury was caused by falling on a rock,[2] but when pressed about the presence of sperm in her vagina, she claimed the boy downstairs had raped her.

Only upon further questioning by her mother two years later, after she had accused appellant of raping her on September 14, 1982, did the complainant name appellant as the rapist in the 1980 incident. She also claimed that on September 14, 1982, appellant came to her house, first asking to see her brother (who wasn't home), then asking to use the telephone. Once inside, according to the complainant, he came toward her, pinned her down, and inserted his penis inside her vagina. She testified she managed to kick him, at which point he got up, threatened her not to tell anyone, and left. She called her mother at work, but was unable to reach her, and cried on her bed until her mother came home. She told her mother of the present rape, and responded affirmatively when asked if appellant also had raped her in 1980.

The mother of the complainant testified that she and appellant had lived together for five years, but had separated about five years prior to trial, and that the relationship between appellant and her daughter was "like a father and daughter." When appellant brought her daughter home from a planned shopping trip in December 1980, her daughter had run straight to the bathroom holding her stomach; she followed her and saw her bleeding profusely from the vagina. The mother testified she thought appellant had acted edgy when he was driving them to the hospital, and also claimed she saw blood on his pants zipper at the hospital. According to the mother, the boy downstairs, whom her daughter had accused, was four years old. The mother further testified that after 1980 her daughter avoided being in the same room as appellant, although she admitted that she had told appellant that her daughter liked him when she spoke to him after 1980 about their getting back together and he refused because of the child. In regard to the 1982 incident, the mother testified that

---

1. Appellant was charged with two counts of rape (D.C.Code § 22–2801), carnal knowledge (*id.*), two counts of taking indecent liberties with a child (*id.* § 22–3501(a)), and one count of enticing a minor child (*id.* § 22–3501(b)).

2. At trial, the complainant testified that, when leaving appellant's apartment, she fell on the step and hit her vagina on something hard.

when she arrived home she found her daughter crying on her bed, and upon asking her what was wrong, she had said appellant had raped her both times. The mother then called the police.

The government also called Dr. Kanda, an expert in the field of pediatrics and the pediatrician for the sex abuse team at Children's Hospital, who testified on the basis of her review of the hospital records.[3] The December 1980 record showed that three lacerations were found in the complainant's vagina on December 21, 1980; only one was bleeding at the time of the examination, however. Innumerable sperm also were found in her vagina. The record further showed that she had lost a large amount of blood (about one and one-half quarts) prior to coming to the hospital. Dr. Kanda testified that these injuries were consistent with forcible penetration. However, in response to the prosecutor's questions, Dr. Kanda admitted that the injuries also could have been consistent with falling on a rock, except for the fact the record did not indicate whether the complainant had suffered any bruising or that her clothing was torn, both of which would likely be present had she fallen. The September 1982 record showed only that the complainant had claimed her mother's boyfriend had raped her in January 1981 (apparently referring to the December 1980 incident), and on September 14, 1982, but did not indicate any physical injury or the presence of sperm. On cross-examination the doctor repeated that she had not examined the complainant, but only had reviewed the hospital records, and that the only indica-

tion of sexual activity in the 1982 hospital record was the complainant's statement.

Appellant testified at trial that he and the complainant's mother had a son during the seven years in which they had lived together. On the afternoon of December 21, 1980, he had taken their son, the complainant and two of his other children Christmas shopping. Afterwards they had returned to his apartment where they and his common-law wife watched television until approximately 10:30–11:00 p.m. when he took his son and the complainant home. There, the complainant's mother had told him the child was menstruating, but that was not the cause of the blood she saw. He drove them to the hospital and later returned to the hospital with the mother to visit the complainant. He denied that the complainant's attitude towards him had changed afterwards, and suggested that she and her mother, with whom he did not get along, had connived against him.[4] Appellant's common-law wife corroborated his testimony regarding the events of December 21, 1980, and that the complainant had continued to see appellant with no apparent change in her attitude towards him.

At the hearing on the motion for a new trial, trial counsel[5] testified that he had practiced law for eleven years and had handled approximately thirty sexual assault cases, seven of which had gone to trial. He began representing appellant at his presentment on the 1982 charges, and only learned later about the 1980 incident when charges were filed on November 24, 1984.[6] Counsel testified that since both incidents involved the same complainant it was his theory of the case that the jury

---

**3.** The government claimed it was unable to locate the examining physician for either the 1980 or 1982 incidents.

**4.** Regarding the September 14, 1982 charges, appellant testified he had recently undergone surgery, making sexual relations impossible until his recovery almost a month later; he had voted in the District of Columbia Mayoral primary that day and had seen many other people, but not the complainant, although he had seen her the day before, at which time she told him she had a boyfriend and that he was coming

over so appellant would have to leave. His common-law wife also testified about appellant's operation in September 1982, and that she and the complainant did not get along. Three other witnesses corroborated appellant's alibi for September 14, 1982.

**5.** Appellant had new counsel on appeal.

**6.** Trial counsel could not recall when he first learned of the December 1980 charges.

would either convict appellant of both rapes or of neither rape, and hence the defense should focus on attacking the complainant's credibility. Regarding the 1980 charges, he was of the view that the government had a strong case, because of the medical evidence and the fact appellant admitted being with the complainant on December 21, 1980; he concluded the 1980 case "was not one in which we could offer substantial testimony." Therefore he adopted the trial strategy of attacking the 1982 allegations, for which he had an alibi defense.

Trial counsel explained that when he first began representing appellant on the 1982 charges, before he knew about the 1980 incident, he had thought that using a medical expert's testimony might help the defense in view of the complainant's small size and appellant's large size, and the lack of any sign of sexual activity. He therefore had checked this hypothesis—that it was impossible for a grown man to rape an eleven-year-old girl without causing some physical damage—with a doctor with whom he had exchanged professional favors. After the additional 1980 charges were filed against appellant and he had seen the 1980 medical records during a meeting with the prosecutor, trial counsel informed the same doctor that the 1980 record indicated the complainant had suffered physical injury. The doctor stated this evidence was consistent with complainant's allegations.[7] Trial counsel admitted that he did not discuss his theory of the case with appellant, but testified (contrary to appellant's testimony that trial counsel had never mentioned the medical records to him prior to trial), that he had told appellant that the 1980 record indicated the complainant had been "ripped asunder." He could not recall appellant's

reaction, or whether he had discussed with appellant the fact the 1980 record showed intact sperm.

The trial judge denied the motion for a new trial, finding that the impact of the "quite strong" medical evidence on the jury would not have been any less if trial counsel, who "was aware of how damaging this evidence would be to defendant," had "prepared more thoroughly for its use at trial." The judge found that appellant's trial counsel successfully impeached the complainant, her mother, and the government's medical expert, and that this impeachment constituted adequate representation without presentation of an alternative medical theory. Further, the judge found that even if he had found trial counsel grossly incompetent, he still would have concluded that counsel's deficiencies did not blot out a substantial defense to the 1980 charges since "[a]ny defense which the defendant had to those charges was clearly presented to the jury through the testimony of both the defendant and his common-law wife and was not lost or obscured by the actions of trial counsel."

## II

The well recognized standard for determining whether ineffectiveness of counsel rises to the level of a constitutional violation was first set forth in *Angarano v. United States*, 312 A.2d 295 (1973) (adopting *Bruce v. United States*, 126 U.S.App. D.C. 336, 339–40, 379 F.2d 113, 116–17 (1967)), *reh'g en banc denied*, 329 A.2d 453 (1974). Under this test appellant must demonstrate (1) "that there has been gross incompetence of counsel", and (2) this incompetence "has in effect blotted out the essence of a substantial defense." *Id.* at 298 n. 5.[8] As formulated by the Supreme

7. According to trial counsel, the doctor with whom he had spoken was deceased at the time of the hearing on the motion for a new trial.

8. Appellant initially raised the issue of ineffective assistance of counsel in a letter to the trial judge while the jury was deliberating. After the verdict, the trial judge held a hearing on the allegation, but denied appellant's motion. On

appeal, appellant urges us to adopt the less stringent test set out in *Monroe v. United States*, 389 A.2d 811, *cert. denied*, 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 863 (1978), which is used when the ineffectiveness claim is raised prior to trial. Appellant contends his claim was not an afterthought precipitated by a guilty verdict and, therefore, merits consideration under the

Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), "[t]he Sixth Amendment recognizes the right to the assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results." *Id.* at 104 S.Ct. 2063. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 2064. The defendant must first show "that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment, [and] [s]econd ... that the deficient performance prejudiced the defense. *Id.* Unless a defendant can show both it cannot be said the conviction resulted from a "breakdown in the adversary process that renders the result unreliable." *Id.*; *White v. United States*, 484 A.2d 553, 558 (D.C.1984) (citing *Strickland, supra*).

▪ In conducting this performance inquiry, we look at the totality of the circumstances. *Strickland, supra*, 104 S.Ct. at 2065; *Oesby v. United States*, 398 A.2d 1, 8 (1979). Moreover, because of the difficulties inherent in making this evaluation, the reviewing court must "indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland, supra*, 104 S.Ct. at 2065–66. The defendant, therefore, has a heavy burden. *Jennings v. United States*, 431 A.2d 552, 557 (D.C. 1981). This court has long distinguished between allegations attacking the insufficiency of trial counsel's pretrial actions, as in *Harris v. United States*, 441 A.2d 268

(D.C.1982), and those claiming a total lack of action on the part of trial counsel, as in *Asbell v. United States*, 436 A.2d 804 (D.C. 1981). Mere errors of judgment and tactics as disclosed by hindsight do not, by themselves, constitute ineffectiveness. *Carter v. United States*, 475 A.2d 1118, 1122 (D.C. 1984).[9] Nor will this court engage in vague speculation about the kind of investigation counsel might have conducted. *Williams v. United States*, 421 A.2d 19, 25 (D.C.1980); *Atkinson v. United States*, 366 A.2d 450, 453 (D.C.1976). Instead, appellant must show the allegedly ineffective assistance prejudiced the defense to the point where the trial was not reliable or fair. *Strickland, supra*, 104 S.Ct. at 2069.

▪ The finding of ineffective assistance of counsel is a mixed question of law and fact, *id.* at 2070, and upon review, we will not reverse the trial court's findings of fact if they are supported by evidence in the record, *Moore v. United States*, 457 A.2d 406, 407 (D.C.1983); we owe no deference, however, on the ultimate question of law. D.C.Code § 17–305(a) (1981); *United States v. Allen*, 436 A.2d 1303, 1308 (D.C. 1981); *Giles v. United States*, 400 A.2d 1051, 1054 (D.C.1979).[10] Reviewing all the circumstances, we hold that appellant has not met his burden to show that, as a result of trial counsel's alleged failures, a reasonable probability existed that, but for counsel's unprofessional errors, the result of the trial would have been different. *Strickland, supra*, 104 S.Ct. at 2068.

### A.

▪ Appellant contends the 1980 medical evidence was so strong that without some alternative explanation the jury would al-

---

*Monroe* standard. If an ineffectiveness of counsel claim involves both pretrial and trial performance, as here, the appropriate test is *Gaston v. United States*, 442 A.2d 958, 962 (1982).

**9.** *See Wesley v. United States*, 449 A.2d 282, 284 (D.C.1982); *Williams v. United States*, 441 A.2d 255, 257–60 (D.C.1982); *Jennings v. United States, supra*, 431 A.2d at 557.

**10.** In *Strickland,* which was decided subsequent to the trial court's decision, the Supreme Court stated that the criteria enunciated in its decision would "not require reconsideration of ineffectiveness claims rejected under different standards." 104 S.Ct. at 2069. *But see White v. United States, supra*, 484 A.2d at 558–59 (trial court decision made pre-*Strickland* is reviewed by this court under new standard).

most certainly conclude that he had raped the complainant on the day she spent mainly with him. He claims that trial counsel, therefore, should have presented evidence that it was medically possible that the complainant previously had had intercourse with someone else who had caused the injury described in the medical record, and that her fall when leaving appellant's apartment caused her wounds to reopen. He relies on the affidavit of Dr. Michael A. Rolnick, the Director of the Georgetown University Hospital Emergency Room Department, which was obtained by appellate counsel.[11] In denying the motion for a new trial, the trial judge found that trial counsel was well aware of how damaging the 1980 medical record would be to appellant and for this reason avoided it at trial.

In *Johnson v. United States*, 413 A.2d 499, 503 (1980), this court described the responsibility of trial counsel with respect to developing medical evidence when a defendant is charged with a sex offense. *Johnson* involved a prosecution for taking indecent liberties with a minor child. Trial counsel made no attempt to obtain and examine the medical record or to interview the examining physician as a potential defense witness and thus had totally failed to discover and review pertinent medical records. The court held that the doctor's evidence, at a minimum, would have had a substantial bearing on the credibility of the key government witness, and that the failure to secure the examining physician's testimony, where trial counsel thought the government would call the doctor as its witness, could not be deemed a tactical choice. That testimony, the court opined, "would have elucidated the incompatibility of his medical finding of an absence of trauma with complainant's description of

appellant's acts." *Id.* at 505. Without it, the court observed, "it is highly unlikely the jury would comprehend any contradiction with the complainant's testimony." *Id.* Because of the "failure to develop the obvious significance of this evidence," the court held that a substantial defense had been blotted out and the Sixth Amendment right to counsel had been violated. *Id.* at 503–05.

Trial counsel's handling here of the 1980 medical record was deficient in at least two respects. First, he failed to have a physician or other expert examine the medical record and interpret it for him. Trial counsel was a layman, without any medical training, and his evaluation of scientific documents was based on his reading of the medical record and discussions with the prosecutor. Although he consulted with a physician, the physician was not familiar with the 1980 medical record and counsel did not share the records with the physician. Instead, he related only what his own reading of the record indicated; accordingly, the physician's response was limited by the information he was provided. The record provides no basis for concluding that trial counsel ever tried to contact the examining physician for the 1980 incident.

Second, trial counsel was unprepared to cross-examine the government's medical expert. Counsel was completely unaware that Dr. Kanda would testify and confused at trial about who she was; he thought she was the examining physician for the 1982 incident. That counsel asked a few relevant questions does not obscure the shortcomings of his cross-examination which failed to address omissions and implications in the medical record which a trained eye would have appreciated, as Dr. Rolnick's

---

11. In his affidavit, Dr. Rolnick asserted, based on his review of the 1980 medical record, that:

It is not unusual for lacerations to partially close up and just ooze for a while and then be broken open again by sudden physical stress. The fact that one of [the complainant's] lacerations was bleeding before suturing does not necessarily mean that the tear had been just caused at the onset of bleeding that evening.

\* \* \* \* \* \*

There is no way to tell by th[e cytology] lab report alone if the sperm were motile or not at the time of examination. This means that the sperm could have been deposited as early as 72 hours (or earlier) before the [hospital] examination. There is no other record of other tests done to support the idea of sexual assult [sic] or to help identify the attacker.

affidavit indicates. Rather, counsel's cross-examination of Dr. Kanda was limited to the length of the complainant's stay at the hospital, and whether her clothing would have torn when she fell if she had been wearing jeans or a tough fabric; counsel's other questions related to the fact that Dr. Kanda had not personally examined the complainant and the 1982 medical record. Thus, counsel did not inquire about those parts of the medical record which would have strengthened the inferences that complainant had sustained her injuries by engaging in sexual intercourse with someone other than appellant prior to December 21, 1980.

In circumstances like those presented here, neither recounting a layman's reading of a medical record to a physician, nor discussing the medical record with the prosecutor constitutes an investigation of medical evidence within the meaning of *Johnson, supra,* 413 A.2d at 502. Nor is cross-examining an expert witness on the basis of counsel's lay reading of scientific data consistent with the teachings of *Johnson* about the development of medical evidence. Trial counsel has a duty to conduct an independent investigation of the facts

and circumstances of a given case. As *Johnson, supra,* 413 A.2d at 503, points out, this is especially important where the central issue is the relative credibility of the defendant and key government witnesses. *Johnson,* as well as decisions in other jurisdictions,[12] requires more than a perfunctory or an uninformed examination of medical records for counsel to make a reasoned tactical decision about such evidence. *Compare Alexander v. United States,* 409 A.2d 618, 620 (D.C.1979). We conclude that the record does not support the trial court's findings that trial counsel was "well informed" about the medical record, or had impeached effectively the government's expert with respect to the 1980 medical record. Without being knowledgeable of the medical record, trial counsel's failure to pursue it at trial could not be deemed a permissible tactical decision.

Nevertheless, the failure to discover nonhelpful medical records or to discover but not use the evidence if it would not have been helpful at trial, does not constitute ineffective assistance of counsel.[13] Accordingly, the issue is whether trial counsel's deficiencies deprived appellant of a substantial defense.[14] Appellant contends that

**12.** *Beavers v. Balkcom,* 636 F.2d 114, 116 (5th Cir.1981) (merely calling institution where appellant once institutionalized without speaking to examining physician or subpoenaing the medical records not sufficient, as could not present evidence as to prognosis); *People v. Howard,* 30 Ill.Dec. 120, 122, 74 Ill.App.3d 138, 142, 392 N.E.2d 775, 777 (1979) (failure to investigate and discover medical records denied appellant effective counsel since could not present defense of insanity); *Ex Parte Duffy,* 607 S.W.2d 507, 517 (Tex.Crim.App.1980) (en banc) (failure to interview examining physician or discover medical records constituted ineffective assistance of counsel since could not present defense of insanity).

**13.** *Smith v. Maggio,* 696 F.2d 365, 367 (5th Cir. 1983) (tactical decision not to obtain medical records where other defense existed; counsel discussed defendant's commitment with family, and counsel discussed insanity plea with defendant); *Sweezy v. Garrison,* 554 F.Supp. 481, 494 (W.D.N.C.1982) (tactical decision not to present insanity defense after obtaining pretrial diagnostic evaluations); *Cordes v. State,* 577 S.W.2d 609, 610 (Ark.1979) (en banc) (tactical

decision not to introduce medical records that showed brain damage but no mental incompetence); *People v. Morales,* 254 Cal.App.2d 194, 196, 61 Cal.Rptr. 764, 767 (1967) (failure to subpoena medical records of victim which could not have aided defendant or provided a defense considered tactical decision); *Booker v. State,* 441 So.2d 148, 151 (Fla.1983) (reliance on experts to determine material they needed to render expert opinions considered reasonable); *People v. Berger,* 65 Ill.Dec. 600, 607, 109 Ill. App.3d 1054, 1063, 441 N.E.2d 915, 922 (1982) (failure to seek discovery not shown to prejudice appellant's case) (citing *People v. Howard, supra* note 12; *Amrine v. State,* 579 S.W.2d 844, 845 (Mo.Ct.App.1979) (failure to discover medical records not helpful to defense not ineffective assistance).

**14.** In *Johnson, supra,* 413 A.2d at 504–05, the court defined a "substantial defense" as

not limited to an affirmative defense or the presentation of an alibi defense. A defense may be predicated upon disproving an element of the crime charged or simply discrediting the testimony of the prosecution witness.

highly credible impeachment evidence was lost because counsel stood silent when (1) the absence of a description in the record of the sperm found in the complainant's vagina as "motile" could have been used to suggest the possibility that she could have had intercourse in the previous 72 hours; (2) the notation that only one of the three lacerations was actively bleeding could have been used to suggest the wounds were old and that one had reopened when the complainant fell on December 21, 1980; and (3) the absence of any other tests to identify the attacker could have been used to alleviate the impact of the medical record. The trial court found that "the main thrust" of any defense was presented through defense witnesses as well as effective cross-examination of the government's witnesses, including its medical expert. We agree with this conclusion, but for somewhat different reasons.

Elucidation by trial counsel of the omissions in and implications arising from the 1980 medical record was lacking in the defense case. Neither appellant's nor his common-law wife's testimony could explain the medical record, and trial counsel did not impeach Dr. Kanda's testimony on cross-examination. But, as the prosecutor's direct examination of Dr. Kanda showed, because of omissions, the medical record was not necessarily inconsistent with the view that the injury was caused by a fall; also, the record indicated that only one of the wounds was bleeding. Thus, the absence of information about the age of the lacerations and the identity of the attacker in the medical record, combined with the testimony of appellant and his common-law wife, provided the jury with some evidence from which it might infer the "other man, prior trauma" theory. On the other hand, the

jury's rejection of the theory is consistent with the medical record which showed that the complainant had a small vaginal opening, had suffered three lacerations, and had lost a lot of blood; from this the jury could reasonably infer that a grown man had raped her. Rejection of the theory was also consistent with a reasonable determination of the plausibility of the theory in light of the mother's testimony. If a defense expert had testified or if Dr. Kanda had been effectively cross-examined, the jury might have better understood that the 1980 medical record was not as supportive of the complainant's testimony as it might otherwise have appeared, but that evidence would not have really supported appellant's theory; the jury would still have had to speculate about the other man and that the complainant had hidden her injuries from her mother. Accordingly, although we are troubled by the effect on appellant's defense of counsel's deficiencies in investigating the medical record, we conclude that appellant has failed to meet his burden to show he was prejudiced by those deficiencies.

### B.

Appellant also contends that trial counsel was ineffective by failing to call character witnesses. The trial court found that trial counsel's decision not to call character witnesses was fully explained and within the domain of practical as well as tactical considerations and cannot be characterized as incompetence. Trial counsel testified that he did not try to find such witnesses because he was concerned they would not be able to qualify as character witnesses, and that after appellant was charged with a second offense,[15] counsel thought any char-

---

A substantial defense would be lost, for example, if defense counsel failed to use available prior perjury convictions to impeach the sole prosecution witness, or to use prior inconsistent statements which sharply undercut the witness's credibility. Such failures could "blot out" a substantial defense even where it would be entirely appropriate for the defense to put on no evidence at all of its own. The

defense may rely on the presumption of his innocence and on the government's obligation to prove each and every element of an offense beyond a reasonable doubt. [citations omitted].

15. It is unclear whether counsel was referring to the charges arising from the December 21, 1980 incident or appellant's later alleged assault of the complainant's mother's boyfriend.

acter testimony would be self defeating since the witnesses' testimony would be undermined by evidence of their lack of information. He also admitted that he had not thought at the time that they could find anyone, and claimed appellant did not want a lot of people involved in view of the nature of the charges.

A defendant may advance one or more of his character traits as evidence of his innocence and his presentation of his reputation in the community may be as narrow or as broad as he chooses so long as it remains relevant and germane to the issues at trial. *Michelson v. United States*, 335 U.S. 469, 476, 69 S.Ct. 213, 218, 93 L.Ed. 168 (1948); *Darden v. United States*, 342 A.2d 24, 26 (D.C.1975) (citing *United States v. Fox*, 154 U.S.App.D.C. 1, 4–5, 473 F.2d 131, 134–35 (1972). The government is limited in its cross-examination to the traits raised by the defendant, *Darden, supra*, 342 A.2d at 26, *Fox, supra*, 154 U.S.App.D.C. at 5, 473 F.2d at 135. Once raised, the jury must be instructed that character evidence can raise a reasonable doubt about guilt. *Id.*

The desirability of character testimony was clear since attacking the credibility of the complainant was the key defense theory, according to trial counsel. No objection could have been sustained on the grounds of admissibility or relevance, and in view of appellant's virtually unblemished criminal record and work history, there was little countervailing reason not to present such testimony. At the time of trial, appellant was 36 years old and had no prior criminal record, other than two disorderly conduct arrests in 1970 and 1982. He had been steadily employed as a METRO bus driver for nine years, contributed to the support of his children and the complainant, and, as the affidavits submitted in connection with the motion for a new trial indicate,[16] his co-workers and friends were available.

Trial counsel's explanation for not attempting to identify such witnesses, even though they were apparently available, appears somewhat inconsistent with the fact that he called three witnesses, in addition to appellant and his common-law wife, as alibi witnesses to the 1982 charges. Even according due deference to counsel's professional judgment, trial counsel has an obligation, particularly where credibility is the key issue, to determine whether character witnesses are, in fact, available and could be qualified, and the failure to do so cannot be excused as a tactical decision. We are satisfied, however, that appellant was not harmed since the undisputed evidence of his familial responsibilities and employment was generally before the jury through his own testimony.

### C.

Appellant also accused trial counsel of inadequate pre-trial preparation by not adequately consulting, investigating, or preparing appellant's case and witnesses for trial. The record supports the trial judge's findings that trial counsel consulted with appellant and interviewed defense witnesses, albeit belatedly in some instances and not at all in others.[17] Errors of

---

**16.** Over 150 of appellant's coworkers and friends signed a letter to the trial court requesting a new trial.

**17.** Trial counsel met with appellant at least two to three times in his office with more meetings in the courthouse, spoke to him at least once on the phone, wrote him a letter advising him of witnesses he intended to subpoena and requesting appellant to advise him of any other, potential witnesses; appellant did not show up at one of their scheduled meetings. *See Gaston v. United States*, 442 A.2d 958, 962 (1982) (no ineffective assistance where counsel failed to elicit

appellant's version until four months after appointment); *Monroe v. United States*, 389 A.2d 811, *cert. denied*, 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978) (effective assistance where counsel conferred with appellant only two times immediately prior to trial). Trial counsel interviewed several, although not all proposed defense witnesses, concluding that their stories were not consistent. Trial counsel's investigator also interviewed appellant, his common-law wife, and his sister for several hours after his preliminary hearing, and unsuccessfully attempted to reach the complainant and her mother; trial counsel thought it best not to

judgment and tactics as disclosed by hind-sight do not, by themselves, constitute ineffectiveness.[18] Moreover, with respect to appellant's complaint that trial counsel failed to call defense witnesses to impeach the complainant's credibility, we are satisfied, in view of the strong presumption of reasonableness which attaches to counsel's conduct and his explanations, that these were the type of tactical judgments which do not amount to incompetence.[19] Trial counsel interviewed all these prospective witnesses and made a conscious decision not to put them on the stand because he thought some of the proposed witnesses would be unhelpful, and others harmful; for example, some of the children were quite young and could not remember, and others gave conflicting accounts. The record supports the trial court's finding that counsel impeached the testimony of the complainant and her mother. Applying the presumption applied by *Strickland, supra,* 104 S.Ct. at 2069, we hold that trial counsel's alleged errors were not so prejudicial as to deprive appellant of a fair and reasonable trial. Although appellant may disagree with his counsel's reasoning, the decision of whether to put witnesses on the stand is clearly a tactical decision, and we are satisfied that the decision did not rise to the level of prejudice required under *Strickland.*

### III

Finally, appellant contends counsel was ineffective by not requesting the standard jury instruction 4.78[20] on corroboration, and therefore the trial court, *sua sponte,* should have instructed the jury that corroboration of the complainant's testimony was required, and the failure to do so was plain error. He relies on *Robinson v. United States,* 452 A.2d 354 (D.C.1982) and *Fitzgerald v. United States,* 443 A.2d 1295 (D.C.1982).

 Under *Fitzgerald, supra,* 443 A.2d at 1299, a sexual offense charge involving a non-mature minor "must be submitted to the jury with specific instructions requiring a finding of independent evidence corroborative of the victim's testimony as a condition precedent to a guilty verdict." Hence, the failure of the trial counsel to request or of the trial court, *sua sponte,* to give the corroboration instruction constituted error.[21] *Id.* at 1302; *Watts v. United States,* 362 A.2d 706, 709–10 (D.C.1976) (en banc). However, the failure to give a corroboration instruction does not amount to reversible error when sufficient corroboration evidence of the incident exists. *Morgan v. United States,* 402 A.2d 598 (D.C. 1979); *Williams v. United States,* 385 A.2d 760 (D.C.1978); *Watts, supra,* 362 A.2d at 706; *Moore, supra,* 306 A.2d at 280. Whether the evidence sufficiently corroborates a minor-complainant's testimony depends on the totality of the circumstances, *Fitzgerald, supra,* 443 A.2d at 1300–01; *Wallace v. United States,* 362 A.2d 120, 121 (D.C.1976); *Robinson v. United States,* 357 A.2d 412 (D.C.1976); *Douglas v. United States,* 386 A.2d 289, 294 (D.C.1978),

---

pursue the complainant and her mother less they become antagonistic.

18. *Carter v. United States,* 475 A.2d 1118, 1122 (D.C.1984) (failure to object to admission of character evidence); *Wesley v. United States,* 449 A.2d 282, 284 (D.C.1982) (failure to object to admission of evidence contrary to defendant's alibi defense); *Williams v. United States,* 441 A.2d 255, 260 (D.C.1982) (failure to present medical testimony that defendant was incapacitated or of complainant's alcoholism); *Jennings v. United States,* 431 A.2d 552, 557 (D.C.1981) (alleged fruitless and harmful cross-examination and defective closing argument); *Woody v. United States,* 369 A.2d 592, 594 (D.C.1977).

19. *Smith v. United States,* 454 A.2d 822, 825 (D.C.1983); *Jackson v. United States,* 424 A.2d 40, 42–43 (D.C.1980); *Terrell v. United States,* 294 A.2d 860, 864, *cert. denied,* 410 U.S. 938, 93 S.Ct. 1398, 35 L.Ed.2d 603 (1972); *Carter, supra,* 475 A.2d at 1123.

20. Criminal Jury Instructions for the District of Columbia, No. 4.78 (3d ed. 1978).

21. Presently pending before this court en banc is the question whether the corroboration requirement should be abolished. *Gary, Cole & Pee,* Nos. 83–796, 84–703 & 84–997, argued *ab initio* en banc on October 22, 1984.

and is decided on a case-by-case basis. *Banton v. United States,* 411 A.2d 975, 978 (D.C.1980); *Hall v. United States,* 400 A.2d 1063, 1065 (D.C.1979); *Douglas, supra,* 386 A.2d at 294.

■ Corroboration has never been a difficult threshold to cross in this jurisdiction. *Fitzgerald, supra,* 443 A.2d at 1302. Circumstantial factors which may amount to corroboration include complainant's age, opportunity to observe appellant, emotional condition at the time of reporting the incident, consistency of statements regarding the incident, and the opportunity of the defendant to commit the crime, and motive of complainant. *Banton, supra,* 411 A.2d at 978; *Hall, supra,* 400 A.2d at 1065 (reliance on doctor's testimony, emotional state of child); *Douglas, supra,* 386 A.2d at 294. We hold there was sufficient corroboration of the complainant's testimony in the medical evidence, the mother's testimony, the apparent lack of motive for complainant to fabricate the rape, and the emotionally distraught state of complainant observed by her mother and others. Therefore, the failure to give the corroboration instruction was harmless error. *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

In sum, notwithstanding counsel's deficiencies in aspects of preparing appellant's case for trial and in his conduct of the trial, we hold that appellant has failed to meet his heavy burden to show that he was denied his Sixth Amendment right to effective assistance of counsel, and affirm.

*Affirmed.*